Filed 6/2/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JACK MOORE,<br><br>    Appellant,<br><br>    v.<br><br>CITY OF LEMON GROVE et al.,<br><br>    Respondents. | D066670<br><br><br><br>(Super. Ct. No. 37-2013-00045077-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed.

Krause Kalfayan Benink & Slavens and Eric J. Benink for Appellant.

Lounsbery Ferguson Altona & Peak, James P. Lough and Alena Shamos for Respondents.

Trevor A. Grimm, Jonathan M. Coupal, Timothy A. Bittle and J. Ryan Cogdill for Howard Jarvis Taxpayers Foundation as Amicus Curiae on behalf of Appellant.


In this case, a sanitation fee ratepayer, Jack Moore, appealed a judgment denying his petition for writ of mandate and equitable relief as against the City of Lemon Grove

(the City) and the Lemon Grove Sanitation District (the District, together with the City, Respondents). Moore sought to stop Respondents from transferring funds collected as sewer service fees and charges to the City's general fund, claiming the transfers violated Proposition 218, the Right to Vote on Taxes Act. (Historical Notes, 2B West's Ann. Codes, Cal. Const. (2013 ed.) foll. art. 13C, § 1, p. 363.) The trial court concluded that the charges at issue were subject to Proposition 218, but that the transfers did not violate Proposition 218 as the District had used reasonable methods to determine the amounts to transfer. We agree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The District manages and maintains about 67 miles of collection pipes that transport sewage to the City of San Diego treatment plants. The District possesses very little capital equipment and the City has three employees who exclusively perform District-related work. All District maintenance, facilities, administrative equipment, personnel, service, billing, regulatory and other overhead are provided by the City. The other functions required for the District to operate (accountants/finance, receptionists, analysts, engineers, inspectors, plan checkers, etc.) are provided by City employees that divide their time among various activities.

Moore is a resident of the City and a sanitation fee ratepayer. He filed a petition for writ of mandate and complaint for injunctive relief, claiming Respondents provide sewer services and impose fees and charges on users of the sewer services through semi-annual property tax bills. He alleged that Respondents engaged in a practice whereby they transferred funds collected as sewer service fees and charges to the City's

2

general fund. Further, he claimed Respondents failed to earmark these funds for a specific purpose, such as for reimbursement of shared costs or sewer maintenance and operations, but instead used the funds for general governmental purposes. Moore claimed the yearly amount transferred by Respondents to the general fund was not based on the actual costs incurred to support sewer maintenance and operations, but was calculated as about 22 percent of the annual sewer service fees collected.

Moore sought a petition for writ of mandate directing that Respondents stop all transfers to the general fund and restore all previously transferred funds received by the general fund. He also sought a declaration of rights declaring that Respondents violated article XIII D (article XIII D) of the California Constitution and an injunction enjoining Respondents from transferring funds to the general fund and requiring them to repay all previously transferred funds received by the general fund.

After considering the parties' evidence, the trial court issued a tentative ruling concluding that the sanitation fees and charges at issue were subject to Proposition 218, but finding Respondents did not violate Proposition 218. The trial court later confirmed its tentative ruling. Thereafter, the court issued a judgment denying Moore's petition for writ of mandate. Moore timely appealed. We granted the application of the Howard Jarvis Taxpayers Association to file an amicus curiae brief on behalf of Moore.

DISCUSSION

I. *General Legal Principles*

"In 1978, California voters enacted Proposition 13, which amended the California Constitution by adding article XIII A (article XIII A). The amendment

3

'plac[ed] significant limits on the taxing power of local and state governments.' [Citation.]  As pertinent here, article XIII A, section 4 provides, 'Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district . . . .'"  (*City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 760-761 (*Shapiro*), italics deleted.)

"In 1996, California voters enacted Proposition 218, which added article XIII C (article XIII C) and article XIII D (article XIII D) to the California Constitution in order to 'close government-devised loopholes in Proposition 13.'"  (*Shapiro*, *supra*, 228 Cal.App.4th at p. 761.)  "[T]he primary purpose of Proposition 218 was to reform the law governing local government's imposition of revenue generating devices *other* than special taxes . . . ."  (*Id.* at p. 779.)  A "fee" or "charge" is defined as "any levy *other* than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service."  (Art. XIII D, § 2, subd. (e).)

Section 6 of article XIII D sets forth the procedures and requirements governing property-related fees and charges.  As relevant here, section 6 provides: a fee cannot be charged in excess of the service provided; a fee can only be used for the purpose it was charged; and the fee may not be imposed for general governmental services.  (Art. XIII D, § 6, subd. (b)(1), (2) & (5), hereinafter section 6(b)(1), (2) or (5).)  "The theme of these sections is that fee or charge revenues may not exceed what it costs to provide fee or charge services.  Of course, what it costs to provide such services includes all the required costs of providing service, short-term and long-term, including operation,

4

maintenance, financial, and capital expenditures. The key is that the revenues derived from the fee or charge are required to provide the service, and may be used only for the service. In short, the section 6(b) fee or charge must reasonably represent the cost of providing service." (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 647-648 (*Roseville*).)

As one court that examined a regulatory fee noted, some fees "are not easily correlated to a specific, ascertainable cost. This may be due to the complexity of the regulatory scheme and the multifaceted responsibilities of the department or agency charged with implementing or enforcing the applicable regulations; the multifaceted responsibilities of each of the employees who are charged with implementing or enforcing the regulations; the intermingled functions of various departments as well as intermingled funding sources; and expansive accounting systems which are not designed to track specific tasks." (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 950.) Thus, courts afford agencies a reasonable degree of flexibility "to apportion the costs of regulatory programs in a variety of reasonable financing schemes." (*Ibid.*)

The agency charging the fee or charge has the burden of demonstrating compliance with these requirements. (§ 6(b)(5).) The question whether a fee or charge violates article XIII D is subject to de novo review. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 450.) We presume that the appealed judgment is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Even when we exercise our independent judgment in reviewing the

5

record, we do not decide disputed issues of fact (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 912) and our review "is limited to issues which have been adequately raised and supported in [the appellant's] brief." (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

II. *Analysis*

The trial court concluded that the sanitation fees and charges at issue were fees as defined in article XIII D, section 2, subdivision (e) of the California Constitution and thus, were "property-related fees subject to [Proposition] 218." This finding is not at issue. Rather, Moore contends the money transferred by Respondents from the sanitation fund to the general fund is illegal because the transfers were not properly tied to actual costs incurred for the District's benefit and Respondents never properly identified and quantified the costs. Moore alleges a violation of three specific subdivisions of section 6. Accordingly, we address each subdivision in turn, examining whether the District met its burden of demonstrating compliance with the requirements of section 6.

A. The Fees Were Not Spent for Unrelated Revenue Purposes

A fee may only be used for the purpose it was charged. (§ 6(b)(2).) Here, the fees at issue were collected from property owners and described as sewer service charges. Accordingly, Respondents may appropriately spend these fees on anything related to the maintenance and management of the sewer system. We consider "all the required costs of providing service, short-term and long-term, including operation,

6

maintenance, financial, and capital expenditures." (*Roseville*, *supra*, 97 Cal.App.4th at p. 648.)

The District presented evidence showing most functions required for it to operate are provided by City employees that divide their time among various activities. In return, the District reimburses the City for these services and expenses related to these services. Cathleen Till, the City's finance director, explained that basic operational tools that the District requires to operate include: support staff, accounting software, accounts payable staff, computer and "GIS" systems, human resource services, executive management and support, inspection services, engineering staff, design programs and tools, and receptionist staff. Because the District does not possess any of these software programs, computer systems, personnel, expertise, buildings for office space, etc., it relies on the City to provide these services.

Graham Mitchell is the city manager and serves as executive director for the District. As the District's executive director, Mitchell oversees the overall operation of the District, manages the employees that provide direct and support services to the District, manages the overall budget, provides policy recommendations to the District's board of directors and ensures that the District is fiscally solvent.

Mitchell explained that the shared staffing approach utilized by the District and the City creates effective economies of scale and saves the taxpayers and ratepayers of the City and the District. Mitchell also stated it is common practice in California for a city manager to provide executive management for several city-related enterprises and

7

for city staff to provide support for the other city-related enterprises such as a sanitation district.

Mitchell attempts to ensure an equitable and reasonable exchange of personnel and services between the City and the District. To manage the exchange of personnel and services between the City and the District, he utilizes an accounting practice in which the District transferred reimbursements to the City under two categories— "'Interfund Transfers for Operations'" and "'Interfund Transfers for Administrative Services.'" Interfund Transfers for Operations relates to the direct personnel costs that the City incurs to manage and operate the District (direct costs) and the Interfund Transfers for Administrative Services represents the overhead costs associated with operating the District (indirect costs).

Till explained how the City and the District apportion indirect costs. For example, the telephone in the one-room office used by the District is charged as a direct cost to the sanitation program. However, a percentage of the telephones used by the supervising public works director, city manager and other employees who spend part of their working hours performing sanitation duties is apportioned as an indirect cost to the District. The apportionment is done in accordance with the City's best estimate of the actual time spent on sanitation matters. Till stated that general department overhead is apportioned to the general fund if services are provided to the District by that department.

Mitchell stated that Moore's inquiries over the past few years have prompted the City to create a better system to document transfers between the District and the City.

8

After consulting with the San Diego County Grand Jury auditor, the City developed a method to determine overhead costs. The City first determines its total overhead-related costs for building expenditures, accounting software, copiers, utilities, etc. It then determines each fund or activity's share of the overhead costs by examining the budgeted expenditures for each fund or activity. Mitchell explained that the challenge with using an expenditure model is that in any given year, expenditures can fluctuate greatly. For example, the District could have $2 million in capital improvements, which would increase its share wildly that year. Because this anomaly exists, Mitchell explained that it makes more sense to base each fund's or activity's share of overhead on revenue.

Till similarly stated that revenue estimates are a good indicator of general time spent by the support departments of each special fund when dividing overhead costs and provided the following as an example. Assuming she gets thirty phone calls a day about various business items. Each phone call may discuss a different budget fund. A call from the public works director may raise five or six special fund issues. Cost allocation by time sheet could not capture the allocation of each of these costs. However, a general allocation method based on how much money flowed through into the programs would be a more accurate measure of the actual time spent and the loaded costs of each employee's time in each program.

Till noted that counting tasks assigned to each manager would be a misleading way to determine overhead costs, using the handling of tort claims by the risk manager/public works director as an example. She stated that most street-related claims

9

involve tire or wheel damage due to pot holes.  These claims have a very standardized process and seldom are a significant cost item.  In contrast, sewer damage claims happen once or twice a year and take up significant time and resources.  Till explained that for sewer backups, the District must respond as if it is the District's fault unless proven otherwise.  This entails significant environmental cleanup costs and costs for damage to the household and often hotel bills.  It is a time-intensive process even if it is later determined that the District was not at fault.  The risk manager, city manager, city attorney, public works crews and outside contractors are involved for sewer backup clams.  Accordingly, one claim for tire damage and one sewer backup claim are not equal from a cost allocation perspective.

Significantly, Moore conceded at oral argument below that when a cost is incurred for the joint benefit of different divisions within a city or local government, those costs may be allocated.  Moore explained that the principle used by Respondents was "okay," but that the methods used were "too ad hoc" and "not subject to any kind of objective criteria."  Moore agreed with the trial court's restatement of his argument that he believed the method used by Respondents to estimate and allocate their costs was unreasonable, while Respondents believed the method to be reasonable.  Below and on appeal, Moore relied on the *Roseville* case to support his argument that Respondents did not use a reasonable methodology.

At issue in *Roseville* was an "in-lieu franchise fee" (in-lieu fee).  (*Roseville*, *supra*, 97 Cal.App.4th at p. 638.)  The *Roseville* court explained that "[p]rivate utilities pay public authorities 'franchise fees' to use government land such as streets, or for

10

rights-of-way to provide utility service. [The city] similarly imposes the in-lieu fee on its municipal utilities; 'in-lieu' is the term of choice since the utilities are not private entities." (*Id.* at p. 639, fn. omitted.) The city set the in-lieu franchise fee at a flat four percent of the utilities' annual budgets. (*Id.* at p. 648.) The *Roseville* court concluded that the flat fee on the annual budget violated section 6(b)(1) because the City made no showing that the flat fee represented actual costs, noting "[o]n its face, this fee does not represent costs. It is a flat fee." (*Roseville*, at p. 648.) Once collected, the City transferred the flat fee into its general fund without pledging it for any specific purpose. (*Id.* at p. 650.) The court concluded the transfer violated sections 6(b)(2) and (b)(5) because the flat fee was used to pay for general governmental services, not costs attributable to the services for which the fee was charged. (*Roseville*, at p. 650.)

Similarly, in *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914 (*Fresno*), the city required each municipal utility to "'pay to the City, in lieu of property and other taxes normally placed upon private business,'" an in-lieu fee currently set at one percent of the assessed value of fixed assets of the utility department or division. (*Id.* at p. 917.) The *Fresno* court concluded that the trial court properly prohibited the city from collecting the in[-]lieu fee, noting "[the city] has not even *claimed* the in[-]lieu fee approximates the cost of city services to the utility departments and divisions, much less has it established such a relationship as a fact." (*Id.* at p. 928.) The *Fresno* court stated that if the city wishes to recover all of its costs from user fees, it must reasonably determine the unbudgeted costs of utilities enterprises

11

and that those costs be recovered through rates proportional to the cost of providing service to each parcel. (*Id.* at p. 923.)

The trial court rejected Moore's argument that the instant case was akin to the in-lieu fees at issue in *Roseville*. The court found that, unlike the *Roseville* case, "Respondents provided ample evidence that the amount of money transferred to the [g]eneral [f]und [was] based on reliable estimates of time spent by City workers on sanitation issues." We agree.

In *Roseville* and *Fresno*, each city made no attempt to show that the flat fees represented the actual cost of providing the service as required by section 6(b)(2). (*Roseville, supra*, 97 Cal.App.4th at p. 648; *Fresno*, *supra*, 127 Cal.App.4th at p. 928.) Here, in contrast, Respondents presented evidence on this issue. Unlike *Roseville* and *Fresno*, Moore's challenge is to Respondents' method of showing they used the fees collected for only the purpose for which the fees were charged. Moore separately addressed personnel costs and overhead costs. We do the same.

As to personnel costs, Moore acknowledged that some city workers spent time on sanitation activities and, to the extent city workers do so, a portion of their salaries can be allocated to the District. Moore explained he is not seeking to cut off salary reimbursements; rather, he is concerned that the salary allocations were not subjected to any level of rigor or objective analysis. At oral argument below, Moore's counsel admitted "[i]n principle" transferring money to the general fund to pay for a portion of nonsanitation worker salaries that worked on sanitation matters was "okay," but complained about the allocation methods used by Respondents. Moore also testified he

12

believed some money should be transferred to the general fund to compensate for employee time.

Thus, at issue is the method used by Respondents to determine the amount of time city workers spend on District activities and thus, the amounts transferred to the general fund. On this issue, Till stated that after sanitation rates are established, she and her staff monitor expenditures to make sure that they stay within budget. Her department tracks direct costs to the sewer program to ensure they stay within budgetary parameters, she interviews department directors and makes adjustments to personnel allocations between various funds, and directors are required to review and analyze for which funds the work of their respective staff applies.

Although Till was not employed by the City during the preparation of the budgets for fiscal years 2009-2010 and 2010-2011, she created spreadsheets for these fiscal years by reviewing previous budgets and identifying the staff allocated to the District. She also reviewed handwritten notes identifying the various individuals with a percentage. Although these spreadsheets were created after the fact, Mitchell stated that Respondents employed the same analysis, albeit informally with written notes justifying the transfers.

Our review of the totality of the evidence shows Respondents' methods were informal. For example, although Mitchell asked Till to interview each of the department directors to identify the amount of time spent on District activities and then interview individual staff members to verify the amount of time, Till never interviewed employees to determine if the percentages were accurate. Similarly, Till did not provide

13

instructions on determining percentages. She assumed that based on their supervisory roles, directors knew what percentage of time employees were spending on certain directives. While the informality of Respondents' method for determining the percentage to time employees spend on District matters is not ideal, we concur with the trial court's implied conclusion that no unconstitutionality exists.

As to overhead costs, Till stated that "[g]eneral department overhead is apportioned to the General Fund *if* services are provided to the [District] by that [particular] department." (Italics added.) After the City determines its total overhead related costs, it then determines each fund or activity's share of the overhead costs by examining the budgeted expenditures for each fund or activity. Mitchell explained it makes more sense to base each fund's or activity's share of overhead on revenue and not expenditures as expenditures can vary greatly year to year.

The District's revenue is specifically tied to expenditures through the Lemon Grove Sanitation District Wastewater Enterprise Rate Study (the Five-Year Rate Study). An independent consultant develops the Five-Year Rate Study by reviewing past and projected expenditures, such as costs associated with capital improvement projects, sewer line maintenance, contracted services, and administration (including indirect operational costs). The Five-Year Rate Study averages out costs over a five-year period and then determines the revenue required to cover those charges from year to year to avoid ratepayers experiencing spikes in sewer bills the year of a large capital project. Mitchell explained that this process helps to ensure that ratepayers do not overpay for sewer services.

14

Moore argues that Respondents transferred a flat fee to the general fund that bore no relation to costs. He cited evidence that for the 2010-2011 fiscal year, Respondents transferred a flat 11 percent of sanitation revenues to the general fund as administration/indirect costs and the following fiscal year, this percentage increased to 13.5 percent. This argument is misleading as it ignores the methodology used by Respondents to calculate the percentages transferred. Namely, Respondents calculated the percentage to transfer to the general fund by dividing sanitation expenditures by sanitation revenue. As Mitchell explained, reviewing staff report time revealed that amounts budgeted for sanitation "pretty close[ly]" corresponded to time actually spent on sanitation matters.

Moore asserts Respondents provided no authority to support their "revenue-centric methodology," noting Respondents argued in conclusory fashion that their method of cost allocation was reasonable and legal. We disagree.

Here, Respondents presented evidence regarding the methods used and the trial court found the evidence showed "apportioning the funds based on revenue [was] reasonable under the circumstances." This evidence consists mainly of declarations from the City's manager, finance director and clerk. While Moore is dissatisfied with the explanations provided by these individuals regarding Respondents' cost allocation methods, these explanations constitute evidence and the trial court impliedly found the evidence satisfied Respondents' burden of demonstrating compliance with the requirements of section 6.

Moore presented no expert testimony or other authority showing Respondents' allocation methods were illegal or otherwise improper. Rather, cost allocation methods used by governments present a subject beyond the trial court's and our common experience and knowledge. (Evid. Code, § 801, subd. (a) [an expert's opinion must relate to a subject matter that is sufficiently beyond common experience that it assists the trier of fact].) On this record, we cannot conclude that Respondents' cost allocation methods were improper or that Respondents improperly spent fees for unrelated revenue purposes in violation of section 6(b)(2).

B. The Fees Were in Amounts Necessary to Accomplish Their Purpose

We next examine whether the fees imposed by the District exceeded the cost of providing the service. (§ 6(b)(1).) As a preliminary matter, we note Moore did not specifically challenge in his appellate briefing the trial court's implied conclusion that Respondents did not violate section 6(b)(1). Nonetheless, because the parties generally jumbled all their arguments together, we exercise our discretion to address this issue. To show a fee is "'not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.'" (*Collier v. City and County of San Francisco* (2007) 151 Cal.App.4th 1326, 1346.)

As explained above, we determined Respondents appropriately spend the fees collected from ratepayers on the maintenance and management of the sewer system.

16

The District explained its revenue is tied to expenditures through the Five-Year Rate Study and we concluded that Respondents reasonably apportioned the funds based on revenue. (*Ante*, Part A.)

As allowed by law, the Five-Year Rate Study identifies the maximum fee increases that the District can apply annually. This same approach was used in the previous rate study published in 2007. The District board annually determines whether the estimates identified in the Five-Year Rate Study are accurate based on new cost conditions. In 2007 and 2011, the District board increased the sanitation rates consistent with the amounts set forth in the current and prior Five-Year Rate Study. In later years, the District lowered the rate increases to an amount below that set forth in the current the Five-Year Rate Study. After sanitation rates are established, the City finance department monitors expenditures to make sure they stay within budget. Additionally, direct costs to the District are tracked to ensure they stay within budgetary parameters. Finally, Till interviews department directors and makes adjustments to personnel allocations between various funds. This evidence sufficiently tied the rates charged by the District to the amounts needed to run the District as required by section 6(b)(1).

C. The Fees Were Not Imposed for General Governmental Services

Section 6(b)(5) provides in part: "No fee or charge may be imposed for general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property owners." Viewed in conjunction with section 6(b)(1) and (2),

the purpose of section 6(b)(5) is to require that a fee or charge collected from ratepayers be used to pay for the service for which the fee or charge was imposed and not general governmental services.

To show a violation of section 6(b)(5), Moore relies on the following discussion in *Roseville*: "[The city] concedes that '[r]evenue from the in[-]lieu franchise fee is []placed in [the city's] general fund to pay for general governmental services. *It has not been pledged, formally or informally[,] for any specific purpose*.' This concession runs afoul of section 6(b)(2) that '[r]evenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed.' It also contravenes section 6(b)(5) that '[n]o fee or charge may be imposed for general governmental services. . . .'" (*Roseville*, *supra*, 97 Cal.App.4th at p. 650, italics added.)

Namely, Moore cites to the above italicized language to assert Respondents violated section 6(b)(5) because they failed to earmark or pledge the transferred funds for any specific purpose. Rather, once Respondents determined the proper amount needed to cover the District's share of personnel and overhead expenses, the funds were placed in the City's general fund. Although not specifically argued by Moore, he appears to suggest that the funds placed in the general fund need to be specifically earmarked as payment for particular overhead or personnel costs of the District. We conclude Respondents' action did not violate section 6(b)(5).

First, as addressed above, *Roseville* is distinguishable because the city imposed a flat fee to cover the cost of water, sewer, and refuse collection services, but failed to

18

connect the flat fee to the cost of providing these services. (*Ante*, Part A.) Significantly, after noting fees "must reasonably represent the cost of providing [the] service," the *Roseville* court stated, "In line with this theme, [the city] may charge its water, sewer, and refuse utilities for the street, alley and right-of-way costs attributed to the utilities; and [the city] may transfer these revenues to its general fund to pay for such costs (the general fund supports or pays for [the city's] streets, alleys, and rights-of-way)." (*Roseville*, *supra*, 97 Cal.App.4th at p. 648.) The *Roseville* court reaffirmed this statement at the end of its opinion: "As noted, [the city] may place in its general fund the revenues derived from a cost-based in-lieu franchise fee to pay for the street, alley and right-of-way costs attributed to the water, sewer and refuse utilities." (*Id.* at p. 650.) In other words, if fees are properly linked to costs, section 6(b) does not prevent those properly imposed fees from then being placed in a general fund. The statement of the *Roseville* court that the funds transferred to the general fund were not earmarked or pledged for any specific purpose must be considered based on the facts presented.

Here, Respondents presented evidence linking the fees to its costs and showing its fees did not exceed the cost of providing the service. (*Ante*, Parts A & B.) The District then reimburses the City for services and expenditures related to the services provided by the City. As Till stated, the general fund, can subsidize any other fund, including sanitation. Respondents' action of reimbursing the general fund for its costs did not violate section 6(b)(5).

19

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

McINTYRE, J.

WE CONCUR:

NARES, Acting P. J.

O'ROURKE, J.