Filed 7/15/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARK COZIAHR,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>OTAY WATER DISTRICT,<br><br>      Defendant and Appellant. | D081099<br><br><br>(Super. Ct. No. 37-2015-00400000-CU-MC-CTL) |
| MARK COZIAHR,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>OTAY WATER DISTRICT,<br><br>      Defendant and Appellant. | D081606<br><br><br>(Super. Ct. No. 37-2015-00400000-CU-MC-CTL) |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Affirmed in part, reversed in part, remanded with directions.

Artiano Shinoff, Daniel R. Shinoff, Jack M. Sleeth, Jr.; Hanson Bridgett, Claire H. Collins, Adam W. Hofmann, Rosslyn Hummer, Patrick

Burns and Breana L. Burgos for Defendant and Appellant.

Daniel S. Hentschke for Association of California Water Agencies, California Association of Sanitation Agencies, California Special Districts Association and League of California Cities as Amici Curiae on behalf of Defendant and Appellant.

Gibbs Law Group, Andre M. Mura, Steven M. Tindall; Scott D. Levine and Scott D. Levine for Plaintiff and Appellant.

Ross, Wolcott, Teinert & Prout, William C. O'Neill; Ciresi Conlin, Katie Crosby Lehmann, Kyle W. Wislocky and Patrick A. Cochran for Mesa Water District as Amicus Curiae on behalf of Plaintiff and Appellant.


Plaintiff Mark Coziahr brought a class action against the Otay Water District (Otay), alleging Otay imposed tiered water rates on single-family residential customers (SFRs) that violated a constitutional requirement added by Proposition 218 known as Section 6(b)(3). (Cal. Const., art. XIII D, § 6, subd. (b)(3).)[1] Under Section 6(b)(3), a property-related fee or charge "shall not exceed the proportional cost of the service attributable to the parcel." The burden is on the local governmental agency to "demonstrate compliance" in a legal action as to fee validity. (Section 6(b)(5).)

After certifying the class, the trial court determined Otay did not meet its burden as to Section 6(b)(3). In a subsequent remedy phase, the court considered proposed refund calculation methods; used a classwide approach that included all water charges; and indicated it would hold a later individual allocation phase. The court awarded an estimated refund of approximately $18 million, with monthly increases until Otay imposed rates consistent with

---

[1] Further section references are to article XIII D of the California Constitution, unless noted.

2

Section 6(b)(3). The court entered judgment for Coziahr, which stated Otay remained free to use any compliant rate structure.

Otay appeals from the liability decision and damages, while Coziahr appeals only as to damages. On liability, Otay contends the trial court should have accepted its "reasonable, cost-based" approach, and improperly required "perfection." On damages, Otay argues a refund was not authorized by Proposition 218; the trial court did not make a damages finding, and there was no support for one; and the court's calculations were speculative. Coziahr, on cross-appeal, argues that only the overcharges at the two highest tiers should have been included in the refund calculations, and the court's method amounted to an unpled and unjustified offset.

We affirm the judgment as to liability, the availability and existence of damages, and the trial court's inclusion of all charges in the damages calculation. However, we conclude the court's calculations were unreasonable, and remand for a new trial on the refund amount.

FACTUAL AND PROCEDURAL BACKGROUND

I. *Underlying Events*

Otay operates a water utility service in southeastern San Diego County. Otay's water customers are grouped into four classes: single-family residential (SFR), multi-family residential (MFR), commercial, and irrigation.

Otay divides its water charges into two parts: fixed and variable. Fixed charges include "pass-through charges from the San Diego County Water Authority (CWA) and the Metropolitan Water District (MWD)" and the "District system fee," which is based on meter size. According to Otay budgets during the relevant time, pass-through charges cover "construction, operation and maintenance of aqueducts and emergency storage projects," and the system fee is for "water system replacement, maintenance, and

3

operation." Variable charges include water rate charges, energy charges (to cover elevation-related pumping), penalties, and, when applicable, improvement district charges. Variable water rate charges are based on consumption units of one hundred cubic feet (HCF).[2]

Otay periodically directs consultants to prepare a cost of service study, or rate study. In 2013, Otay retained WS Atkins (Atkins), and in 2017, it retained HDR Engineering, Inc. (HDR) for such studies. Both firms relied in part on water rate cost of service methodologies from an American Water Works Association (AWWA) manual titled, "M1 Manual, Principles of Water Rates, Fees and Charges" (M1 Manual).[3]

From 2014 to 2017, Otay used a tiered rate structure for all classes of customers, including SFRs. Customers subject to volume-based tiers pay a higher price for water units at each increasing tier. In 2018, Otay made changes to the SFR tiers, and moved commercial and irrigation customers to uniform rates (i.e., no price increase based on volume).[4] We describe the rate studies used by Otay below.

---

[2]   The terms "charge" or "fee" generally refer to the method by which costs are recovered, while "costs" means the expenses themselves.

[3]   A copy of the M1 Manual (7th Ed., 2017) is in the record.

[4]   From 2014-2017, the SFR conservation tier applied to 0-5 HCF (if overall consumption was 10 or less HCF), Tier 1 was 6-10 HCF, Tier 2 was 11-22 HCF, and Tier 3 was 23 or more HCF. In 2018, the conservation tier was eliminated, Tier 1 became 0-10 HCF, and Tiers 2 and 3 stayed the same.

## II. *Litigation*

### A. *Class Action Lawsuit Challenging Rates*

In July 2015, Coziahr filed a class action complaint and petition for writ of mandate against Otay for violating Section 6(b)(3).[5] He alleged Otay's SFR tiered water rates were "arbitrary" and did not "correspond to the actual cost of water service" to the parcel, as required. He sought (i) declaratory relief, (ii) injunctive relief, (iii) restitution damages based on excessive fees, and (iv) a writ of mandate to compel Otay to comply with its mandatory duties and reimburse unlawfully collected charges.

Coziahr moved for class certification. Otay disagreed on the statute of limitations period, to which the parties later stipulated. The trial court certified the class, which was defined as "All single-family residential customers of the Otay Water District who received water service" after July 14, 2014. The case proceeded to trial in liability and damages phases.

### B. *Liability (Phase I)*

The trial on liability proceeded as follows. Coziahr filed an opening brief, Otay filed an opposition, and Coziahr filed a reply. The parties also filed expert declarations and/or reports. Otay's expert was Jason Mumm, an executive consultant at a firm specializing in municipal water rate development. His report included an "independent analysis" of Otay's rates. Coziahr's expert was David Vondle, a management consultant with experience in utility-related matters. The rate studies were in the administrative record, which was lodged in the trial court.

---

[5] Coziahr's initial complaint included the City of San Diego. His case was severed, the original case continued in *Patz v. City of San Diego*, and it also proceeded to class certification, judgment, and a refund. Appeals there are proceeding in the Fourth Appellate District, Division 2.

In June 2021, the trial court held a hearing at which counsel presented argument. In March 2021, the court issued the Phase I Statement of Decision.

The trial court found Otay "failed to demonstrate by substantial evidence that its 2013 and 2017 tiered water rates were proportional to the cost of service attributable to each customer's parcel, as required by Proposition 218." The court determined, inter alia, that (i) the SFR tiered rate structures were based on "non-cost objectives such as conservation," and had similar defects to the rate structures used in *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493 (*Capistrano*) and *City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926 (*Palmdale*); (ii) the record did not support Otay's reliance on "peaking factors" (i.e., ratios meant to capture peak versus average demand) to justify its SFR rates; and (iii) Mumm's post-hoc analysis did not support the constitutionality of Otay's SFR rates.

C. *Damages (Phase II), Posttrial Proceedings, and Judgment*

The case proceeded to Phase II, during which the parties proposed different refund calculation methodologies. The parties continued to retain Mumm and Vondle as experts. In June 2022, the trial court issued its Phase II Statement of Decision, awarding an estimated refund of $18,105,256.60 (to increase $208,762.50 monthly, pending compliant rates, and to be adjusted for individual allocations later).

In June 2022, Otay filed an opposed motion for new trial, arguing that damages were unavailable for a violation of Proposition 218. Otay also objected to the proposed judgment on this basis. The trial court denied the motion and overruled the objections.

In August 2022, the trial court entered judgment for Coziahr (filed in January 2023 nunc pro tunc), consistent with the statement of decision for each phase. Otay was "ordered to impose future water rates consistent with . . . [Section 6(b)(3)], and may use tiers, a uniform rate, or any other method, provided [Otay] complies" with that section.

Both parties appealed. The Association of California Water Agencies, the California Association of Sanitation Agencies, California Special Districts Association, and League of California Cities (local agency amici), filed an amicus curiae brief on behalf of Otay. Mesa Water District filed an amicus curiae brief for Coziahr. The parties filed answering briefs.

DISCUSSION

I. *Otay's Appeal Regarding Liability*

Otay contends the trial court failed to consider whether it made a "reasonable, cost-based" showing under Section 6(b)(3), instead requiring "perfection," and Otay's evidence was sufficient to prove constitutional compliance. Otay also contends the court erred in applying *Capistrano* and *Palmdale*, and made certain other mistakes. We conclude the court used the proper level of scrutiny, it appropriately applied the case law, and that substantial evidence supports its resolution of the disputed factual issues.

A. *Proposition 218 and Water Rate Cases*

We begin with additional background on Proposition 218, as well as the cases focused upon by the trial court, *Capistrano* and *Palmdale*.

1. *Background on Proposition 218*

"Proposition 218, approved by voters in 1996, is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees." (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 380 (*Plantier*).) The "first of these measures was Proposition 13," which

7

"limited ad valorem property taxes" and "prohibited counties, cities, and special districts from imposing special taxes without a two-thirds vote of the electorate." (*Ibid.*, fn. omitted; art. XIII A, §§ 1-2, 4; see also former § 3 [new state taxes must be imposed by two-thirds vote of the Legislature].) However, local governments "were able to circumvent [these] limitations" by "labeling them fees, charges, or assessments rather than taxes." (*Plantier*, at p. 381.)

"To address these and related concerns, voters approved Proposition 218, known as the 'Right to Vote on Taxes Act,' which added articles XIII C and XIII D to the California Constitution." (*Plantier, supra*, 7 Cal.5th at p. 381.) The preamble stated the "measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Prop. 218, § 2, p. 108.) The California Supreme Court has observed that "[i]n passing Proposition 218, the voters clearly sought to limit local government's ability to exact revenue under the rubric of special assessments." (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 446 (*Silicon Valley*); *id.* at p. 445 [legislative analyst found it " 'would be easier for taxpayers to win lawsuits' "; Prop. 218 "was intended to make it more difficult for an assessment to be validated in a court proceeding"].)

"Article XIII D imposes distinct procedural and substantive limitations." (*Plantier, supra*, 7 Cal.5th at p. 381.) The "substantive limitations on property-related fees appear in subdivision (b) of article XIII D, section 6" (Section 6(b)). (*Plantier*, at p. 382, italics omitted; see *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 647-648 (*Roseville*) ["theme" of Section 6(b) is that fees "may not exceed what it

8

costs to provide . . . services," which "includes all the required costs . . . including operation, maintenance, financial, and capital expenditures"].)

The limitation at issue here, Section 6(b)(3), states the "amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel." This "requirement 'ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel.'" (*Plantier, supra,* 7 Cal.5th at p. 382; *id.* at pp. 381-382 [Section 6(b)(3) "concerns the method used to allocate a property-related service's aggregate cost among fee payors" (italics omitted)].) Section 6(b)(5) is also pertinent, as it provides that "[i]n any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance . . . ."[6]

Voters later approved Proposition 26, which, among other things, amended the state tax limits of article XIII A to " 'close perceived loopholes' in Proposition 13." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1047 (*CBIA*).)

### 2. Capistrano *and* Palmdale

We briefly describe the seminal Proposition 218 cases relied upon by the trial court. We start with the earlier decision, *Palmdale.*

---

[6] The other limits are as follows: Sections 6(b)(1) (revenues from fee "shall not exceed the funds required to provide the . . . service"), 6(b)(2) (revenues "shall not be used for any purpose other than that for which the fee . . . was imposed"), 6(b)(4) (no fee "may be imposed" unless "service is actually used by, or immediately available to" property owner), and 6(b)(5) (no fee "may be imposed for general governmental services," where "service is available to the public at large in substantially the same manner" as property owners).

9

*Palmdale* involved a city's action against a water district that imposed a tiered rate structure with higher rates for irrigation customers. (*Palmdale, supra*, 198 Cal.App.4th at p. 930 [top tier started above 175% of water budget use for residential, 190% for commercial, and 130% for irrigators].) The city, an irrigator, argued the district did not show the cost of service to irrigators was " 'proportionately higher,' " but rather sought to " 'recoup most of its costs' " from them. (*Id.* at p. 934.) Reversing a judgment for the district, the Court of Appeal held irrigators were being "charged disproportionate rates," without "any showing . . . of a corresponding disparity" in the cost of supplying water. (*Id.* at p. 937.) It explained the district failed to "identify any support in the record for the inequality *between* tiers, depending on the category of user." (*Id.* at pp. 935-936.) The court also noted the district's consultants had offered a defensible rate structure, which it declined to adopt. (*Ibid.*)

In *Capistrano*, the trial court found a city water agency's tiered rates violated Section 6(b)(3), because it did not "carry its burden of proving its higher tiers reflected its costs of service." (*Capistrano, supra*, 235 Cal.App.4th at p. 1516; see *id.* at pp. 1498-1499 [to set tiers, consultant calculated "four possible budgets for water usage, based on historical data for usage patterns"].) The Court of Appeal affirmed, finding *Palmdale* instructive. (*Id.* at pp. 1506-1507.) It held the agency "had to correlate its tiered prices with the actual cost of providing water at those tiered levels" and failed to do so. (*Id.* at p. 1506.) The court also rejected the agency's contentions that (i) calculating the cost of service at "various incremental levels of usage" was "too complex" to be required, and (ii) if required, it was "necessarily" a "discretionary matter, largely insulated from judicial review." (*Id.* at p. 1505.) The court elaborated:

10

"If the phrase 'proportional cost of the service attributable to *the* parcel' (italics added) is to mean anything, it has to be that [Section 6(b)(3)] assumes that there really *is* an ascertainable cost of the service that can be attributed to a specific—hence that little word 'the'—parcel. Otherwise, the cost of the service language would be meaningless. Why use the phrase 'cost of the service to *the* parcel' if a local agency doesn't actually have to ascertain a cost of service to *that* particular parcel?" (*Ibid.*, third & fourth italics added.)[7]

B.  *Applicable Review Standards*

  1.  *Burden of Proof*

"[A]rticle XIII D, section 6, subdivision (b)(5) puts an important procedural limit on a court's analysis in regard to the burden of proof," by stating " 'the burden shall be on the agency to demonstrate compliance.' " (*Capistrano, supra*, 235 Cal.App.4th at p. 1504, quoting Section 6(b)(5).)

In *Silicon Valley*, the California Supreme Court held courts "exercise their independent judgment" in reviewing agency determinations under article XIII D. (*Silicon Valley, supra*, 44 Cal.4th at pp. 448-449 [addressing Section 4(f), burden provision for assessments; similar to Section 6(b)(5)].) The Court explained that, given Proposition 218's purposes, including "to curtail . . . deference," a "more rigorous standard of review is warranted." (*Id.* at p. 448.) The Court disagreed determinations "must be affirmed if substantial evidence supports them," stating a "valid assessment under Proposition 218" must satisfy its "substantive requirements . . . ." (*Id.* at pp. 447-448; see *Capistrano, supra*, 235 Cal.App.4th at p. 1507 ["[I]t is not

---

[7]    The Court of Appeal also reversed a separate ruling regarding recycled water and Section 6(b)(4), which is not at issue here. (*Capistrano, supra*, 235 Cal.App.4th at p. 1498.)

11

enough that the agency have substantial evidence to support its action.  That substantial evidence must itself be able to withstand independent review."].)

"To carry its burden, an agency must generally provide evidence identifying the data used, analyzing the cost of service, and demonstrating the proportionality of the rate . . . ."  (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1030; see *Malott v. Summerland Sanitary Dist.* (2020) 55 Cal.App.5th 1102, 1111 [plaintiff in Prop. 218 case can submit evidence not presented to agency].)  Courts "may and do disregard conclusory arguments," including when the conclusory statements are in the supporting evidence.  (*Florin*, at p 1031; *id.* at p. 1029 [rejecting district's "rel[iance] on a single document to demonstrate proportionality—the [hearing] notice," where "the notice also contain[ed] only a conclusory statement" (italics omitted)]; *Capistrano, supra*, 235 Cal.App.4th at pp. 1497-1498 [Prop. 218 requires agencies to calculate "actual costs"].)

We reject Otay's description of the trial court's task as "weigh[ing] the evidence in the quasi-legislative rate-setting record to determine if minimum constitutional requirements" are met.  Quasi-legislative review implies deference, and the "drafters of Proposition 218 specifically targeted this deferential standard of review for change."  (*Silicon Valley, supra*, 44 Cal.4th at p. 444; *Capistrano, supra*, 235 Cal.App.4th at p. 1505 [disagreeing cost calculation is a "quasi-legislative, discretionary matter, largely insulated from judicial review"]; see *Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2021) 12 Cal.5th 458, 488-489 [distinguishing prior case limiting evidence to administrative record in challenge to quasi-legislative decision;

explaining Prop. 218 requires independent review, and the "interest in extending due deference" does "not carry the same weight"].)[8]

### 2. *Standard of Review on Appeal*

Like the trial court, we apply our independent judgment in assessing whether Otay's rates violated Section 6(b)(3). (*Capistrano, supra*, 235 Cal.App.4th at p. 1507 ["both trial and reviewing courts are to apply an independent review standard"], citing *Silicon Valley, supra*, 44 Cal.4th at p. 450.) "In applying this standard of review, we will not provide any deference to [Otay's] determination of the constitutionality of its rate increase." (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 912 (*Morgan*).)

"Even when we exercise our independent judgment in reviewing the record, we do not take new evidence or decide disputed issues of fact." (*Morgan, supra*, 223 Cal.App.4th at p. 912; *id.* at p. 913 ["although we use a de novo standard of review here, we do not transform into a trial court"]; *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368 (*Moore*) [we "presume that the appealed judgment is correct"].) Thus, if an "appellant challenges a finding of fact, we must employ the substantial evidence standard of review." (*Morgan*, at p. 917; see *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*) ["Even in cases where the evidence is undisputed . . . , if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences . . . for those of the trier of fact."].)

---

[8]  Accordingly, we also reject Otay's claims that the HDR rate study "cannot be construed as part of the administrative record" for 2013, and that "critiques of the [c]onservation [t]ier have no relevance" to 2017.

Although Otay acknowledges that substantial evidence review applies to disputed factual issues, it also asserts the trial court's "errors are contrary to established law and thus not supported by substantial evidence." To the extent Otay is suggesting the liability issues here are primarily legal, rather than factual, we do not agree. The parties strongly disagreed at trial about whether Otay's evidence was adequate to prove compliance with Section 6(b)(3), presenting disputed facts and inferences whose resolution we review for substantial evidence. (See *Morgan, supra*, 223 Cal.App.4th at pp. 915-916 [although plaintiffs did "not couch it as such," their inadequate data claim "challeng[ed] the sufficiency of the evidence"]; *Howard, supra*, 72 Cal.App.4th at p. 631.)[9]

Finally, we also apply basic appellate briefing requirements. Points must be supported by reasoned argument, authority, and record citations, or may be deemed forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) Points raised for the first time on reply may be forfeited as well. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief."].) Here, we largely deem such belated points forfeited, and address them only as noted.

---

[9] Courts treat the sufficiency of analytical methods and data as factual questions in other contexts as well. (See *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898 [CEQA; challenges to "methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied" involve "factual questions"]; *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 74-75 [insurance rates; "Whether State Farm's data were reliable is a predominantly factual question"].)

C.  *The Trial Court Did Not Impose an Improper Standard on Otay*

Otay argues the issue here is "whether its method to allocate costs proportionally is reasonable," and the trial court instead "subject[ed] [its] data to an impossible standard" of perfection.  (Boldface & italics omitted.)  It further asserts Otay met its burden based on its rate studies and Mumm's expert report.

These contentions lack merit.  As we will explain, being "reasonable" is not sufficient to satisfy Section 6(b)(3), the trial court did not require perfection, and Otay was free to use any analytical cost allocation method so long as there was relevant, verifiable data to support its analysis.  That said, it was for the trial court to assess whether Otay's evidence was sufficient to meet its burden under Section 6(b)(3).

1.  *Reasonableness Is Not the Standard of Proof*

First, Otay asserts the "case law recognizes that courts review rates under Proposition 218 only to determine whether [they] represent 'a reasonable way to apportion the cost of service,'" citing *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, 600-601 (*Griffith*), disapproved on other grounds in *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1209, fn. 6.  On reply, Otay further asserts the trial court "applied an improper legal standard by requiring a higher burden of proof not consistent with reasonableness" (despite claiming its concern was being held to perfection, not a heightened standard).  To whatever extent Otay is urging a focus on reasonableness, we are not persuaded.

As *Capistrano* makes clear, an agency's burden of proof under article XIII D, section 6(b)(3) is to show its water rates are proportional to the "ascertainable cost[s] of service that can be attributed to . . . specific . . .

15

parcel[s]." (*Capistrano, supra*, 235 Cal.App.4th at p. 1505.)  The California Supreme Court has distinguished this proportionality mandate from the reasonable allocation needed for certain levies, including regulatory fees, to be excepted from current state tax voting limits in article XIII A, section 3. (*CBIA, supra*, 4 Cal.5th at p. 1053; art. XIII A, § 3 [change in state statute which results in higher tax must be imposed by two-thirds vote].)  Codified by Proposition 26, the exceptions and applicable burden of proof of article XIII A, section 3, require the state to show the amount of the levy does not exceed the "reasonable costs of the governmental activity," and the allocation method "bear[s] a fair or reasonable relationship" to the payor's burdens on, or benefits from, the activity.  (Art. XIII A, § 3, subds. (b), (d); see *CBIA*, at pp. 1047-1048; see also art. XIII C, § 1, subd. (e) [similar burden for local tax levies, with exception for property-related fees under art. XIII D].)

In *CBIA*, an industry group challenged stormwater permit fees imposed by a state agency pursuant to a larger permit program, arguing in part that the fees were not fairly allocated consistent with article XIII A.  (*CBIA, supra*, 4 Cal.5th at p. 1049.)  The Court disagreed, holding the record showed the fees were "reasonably allocated among fee payors," notwithstanding a small difference between the stormwater fees and attributable program costs. (*Id.* at pp. 1052-1053; see *id.* at p. 1052 ["A 'regulatory fee . . . does not require a precise cost-fee ratio.' "].)  The Court squarely rejected the group's attempted reliance on *Capistrano*, and by extension, the proportionality requirement of article XIII D, section 6(b)(3):

> "[T]he restrictions on property-related fees in article XIII D
> of the state Constitution are different from those imposed
> on regulatory fees by article XIII A.  Article XIII D provides
> that the amount of a property-related fee 'shall not exceed
> the proportional cost of the service attributable to the
> parcel.' . . . Under article XIII A, all that is required is that

16

the record demonstrate a reasonable basis for the manner
in which the fee is allocated among those who pay it."
(*CBIA*, at p. 1053.)

Thus, the California Supreme Court has made clear the proportionality
requirement under article XIII D, section 6(b)(3) demands something *more*
than the reasonable basis standard under article XIII A. To satisfy Section
6(b)(3), then, it is not enough for a water agency to show it uses a reasonable
allocation method. Rather, an agency must show that the method produces
rates that are proportional to costs.

Otay does not establish otherwise. Coziahr contends, and we agree,
that Otay appears to derive its "preferred standard from select quotations
from Proposition 218 decisions that used the word 'reasonable.' " But the
courts were not using the term "reasonable" in defining a standard of proof.
Rather, they were discussing the nexus between the rate and cost of service,
or describing the record while reviewing it for substantial evidence. (See,
e.g., *Capistrano, supra*, 235 Cal.App.4th at p. 1499, fn. 6 [tiered rates are
compatible with Prop. 218 " 'so long as' . . . [they] reasonably reflect the cost
of service attributable to each parcel"]; *Roseville, supra*, 97 Cal.App.4th at
p. 648 [Section 6 "charge must reasonably represent the cost of providing
service"]; *Morgan, supra*, 223 Cal.App.4th at p. 918 [district's workers were
"reasonably accurate in their water measurements"].)

To the extent *Griffith* could be viewed as supporting a reasonableness
standard, its proportionality analysis relied in part on inapposite authority,
and was later criticized by *Capistrano*. (*Griffith, supra*, 220 Cal.App.4th at
pp. 600-601 [group usage was "reasonable way to apportion" there; stating
apportionment does not "lend[ ] itself to precise calculation," citing, inter alia,
*White v. County of San Diego* (1980) 26 Cal.3d 897, 903, a pre-Prop. 13 case];
*Capistrano, supra*, 235 Cal.App.4th at p. 1514 ["When read in context,

17

*Griffith* does not excuse water agencies from ascertaining the true costs of supplying water"; its "comments on proportionality" related only to property location and "trying to apply it to the . . . [Section 6](b)(3) issue[ ] is fatally flawed."].)[10]

Otay's approach is particularly misguided, because each case it cites here *affirmed* a judgment after trial and, in *Morgan*, this court expressly declined to reweigh disputed evidence. (See *Griffith, supra*, 220 Cal.App.4th at pp. 600-601 [affirming judgment for agency in challenge to groundwater extraction fees]; *Capistrano, supra*, 235 Cal.App.4th at p. 1506 [discussed above]; *Roseville, supra*, 97 Cal.App.4th at p. 648 [affirming for plaintiffs; "no showing that the in-lieu fee reasonably represents" costs at issue]; *Morgan, supra*, 223 Cal.App.4th at pp. 900, 915-917 [in affirming judgment for water district, acknowledging its consultant "did not have perfect data," while noting other evidence, including system improvement study; stating data "adequacy. . . was . . . vehemently disputed," trial court "found the [d]istrict's explanation more credible," and it was "not our role to reweigh the evidence"]; see also *Moore, supra*, 237 Cal.App.4th at pp. 373-377 [affirming decision for city in sewer fee dispute under other Section 6 subsections; city's evidence reflected "informal" and "not ideal" procedures, but not unconstitutional ones, and plaintiff offered "no expert testimony"].)

---

10    We note there is a pre-Proposition 218 case, *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 193 that discussed a "standard of reasonableness" in analyzing a Proposition 13 rate challenge; *Capistrano* found the case inapplicable to Proposition 218. (*Capistrano, supra*, 235 Cal.App.4th at pp. 1512-1513 [*Brydon* "simply has no application to post-Proposition 218 cases"; describing it as "part of the general case law" that the Prop. 218 enactors wanted "replaced with stricter controls on local government discretion"].)

2. *Trial Court Did Not Require Perfection*

Otay argues the trial court imposed an "impossible" standard in spite of the fact that ratemaking does not require perfection and is beyond judicial expertise. (See *Morgan, supra*, 223 Cal.App.4th at p. 918 ["section 6 does not require perfection"]; *Moore, supra*, 237 Cal.App.4th at p. 375 ["cost allocation methods . . . present a subject beyond the trial court's . . . experience and knowledge"].) These general principles do not aid Otay, because the court did not require perfection.

First, Otay contends the trial court erroneously determined that, because courts review rates independently, "some greater . . . quality or quantity of evidence was required" and "proportionality must be proven with exact precision and perfect data." We disagree. The court soundly rejected a similar argument by Otay that it was "being held to a standard of perfection," stating the "record shows that Otay has not calculated the actual costs of providing water at various levels of usage" and the court could not "disregard its obligation to enforce Proposition 218 . . . ." The court properly recognized it was required to apply its independent judgment to assess compliance with Section 6(b)(3). Otay identifies nothing in the Phase I Statement of Decision that shows the trial court required more. (Evid. Code, § 664 ["[i]t is presumed that official duty has been regularly performed"]; cf. *People v. Castellano* (1983) 140 Cal.App.3d 608, 612 [rule applies to "proper burden of proof"].)

Second, Otay's reliance on this court's decisions in *Morgan* and *Moore* in support of its claim that the agency needs flexibility in ratesetting is misplaced. As described above, the evidence in those cases was not perfect, but we were reviewing judgments *rendered in favor of* the agencies, with the attendant appellate presumptions and inferences. (*Morgan, supra*,

19

223 Cal.App.4th at pp. 915-917; *Moore, supra,* 237 Cal.App.4th at pp. 374-377.)

Finally, Otay maintains that the administrative records for the 2013 and 2017 ratemakings met its burden of proof, and Mumm's expert opinion confirmed the "sufficiency of those records to justify" the tiers. It further contends the evidence showed it "thought seriously about its costs of service" and set rates that "reasonably allocate[d]" proportional costs. As our analysis of Section 6(b)(3) compliance will reflect, this argument rests on a one-sided, incomplete view of the record and trial court decision.[11]

Here, it suffices to state that having rate studies, and an expert who agrees with them, is not enough. Rather, Otay's evidence had to withstand independent review for compliance with Section 6(b)(3). (*Silicon Valley, supra*, 44 Cal.4th at p. 449; *Capistrano, supra*, 235 Cal.App.4th at p. 1507.) Thus, Otay still had to substantiate the analysis with data that meaningfully captured the cost of service to the parcel for Otay's SFRs. (*Capistrano*, at p. 1505 [" 'proportional cost' " means "there really *is* an ascertainable cost of service that can be attributed to a specific . . . parcel"].) Whether it did so was for the trial court to decide in the first instance. (See *Morgan, supra*, 223 Cal.App.4th at pp. 915-916.)

D. *Compliance with Section 6(b)(3)*

Applying our independent judgment, we conclude Otay did not establish its SFR tiered rates complied with Section 6(b)(3).

---

11    An example is illustrative. The trial court had multiple concerns about HDR's study, as we discuss *post*, but Otay cites one finding in the statement of decision on missing cost detail to suggest the trial court found a "single piece of arguably missing data" invalidated the rate study.

1. *Additional Facts*

    a. *2013 Ratemaking*

When Otay retained Atkins to prepare the 2013 rate study, it was already using a "conservation based tier structure" for all customer classes, consisting of a "three tier increasing block rate with a conservation tier . . . ." At the outset of its rate study, Atkins said the applicable standards for water rates are the AWWA M1 Manual and the California Urban Conservation Council's Best Management Practices (BMP), which "promotes water conservation rate structures." Atkins noted that to "achieve conservation pricing," a utility should, and Otay did, "recover no more than 30 percent of . . . revenue from fixed charges." It also noted "[c]onservation pricing provides economic incentives (a price signal) to customers to use water efficiently."

To carry out its rate study, Atkins followed a three-step process. First, it conducted a revenue requirement analysis. Second, it prepared a cost of service analysis, which involved, among other things, allocating costs to customer classes based on "relative contribution to the cost component." Third, Atkins prepared a rate design analysis. In the rate design section, it identified design criteria, which included "water conservation" and "ability to pay."

Addressing rate design, Atkins stated the "first step in developing a conservation based tier structure is to perform an in-depth water usage analysis" of the prior year, to establish a winter and summer month average. It said the winter average, 10 HCF, "equates to estimated interior water usage and becomes the breakpoint for Tier 1." The summer average, 22 HCF, "equates to normal interior plus exterior water usage and becomes the breakpoint for Tier 2." Usage over 22 HCF (Tier 3) was "considered to be

21

excessive and for irrigation" only. With these breakpoints, 14 percent of SFR water usage was in the Tier 3 category.

Atkins stated the "second step . . . is to establish the dollar amount for each tier," noting Otay used the "base-extra capacity cost allocation methodology" and citing AWWA guidelines. This method first involved dividing the "consumption-related cost . . . into the base, maximum-day, and maximum-hour cost of service." Next, Atkins said:

> "[T]he threshold between blocks (tiers) 1 and 2 is set at the transition between average indoor use and average outdoor use. The objective of this to have block 1 consumption approximate indoor usage and to charge a higher amount for outdoor usage in block 2 to promote conservation. Block 1 pricing is normally set just below the average cost of water and block 2 is set just above the average cost of water. Block 3, which is considered to be in excess of both average interior and exterior water usage, is set at a higher price differential."

Atkins elaborated that above-average users use a "larger portion of the . . . system" and should pay for the "extra capacity to serve their needs," noting "[a]ll water systems must be designed for peak . . . use, not average use." Atkins then stated:

> "To set the rates in each block, [Otay] uses a standard pricing structure. AWWA suggests that block 2 should be set at a level 30 percent higher than block 1 to reflect the cost incurred for increased capacity costs and supply purchases. Block 3 is then set at a price differential of 2 times the rate of block 1 because the capacity requirement is twice that of block 2 (e.g. single family block 1 breakpoint is 10 HCF and block 3 begins at 23 HCF)."

Otay's Board of Directors (Board) reviewed Atkins' rate study at meetings in early 2013. Otay finance manager Rita Bell said the "[t]iers were created to promote conservation . . . ." Atkins representative Karyn Keese noted, "You wish to have 10 to 15% of your users within tier III, top water

22

users, to encourage conservation . . . ." Otay's Chief Financial Officer (CFO), Joe Beachem, was asked if Otay gave "any thought to those customers with larger lots who have implemented efficient landscaping, but are still paying the highest tier." He said the issue came up before and the Board indicated "customers on larger lots will pay the higher water rate due to their consumption. It is a lifestyle choice." The Board later approved the proposed rates.

b. *2017 Ratemaking*

Otay hired HDR to review its rates in light of "recent court decisions" and the "need to continue to maintain cost-based water rates." HDR acknowledged the then-current rate structure had "four pricing tiers, with the first tier specifically designed to encourage conservation"; it later reiterated the tiers were meant to encourage conservation. HDR stated its approach did "not consider . . . non-cost based goals," like conservation.

HDR, like Atkins, conducted a three-step process in its rate study: revenue requirement analysis; cost of service analysis; and rate design. It explained the system had to "supply water . . . when demanded," and the "time of greatest demand is known as peak demand." HDR developed "peaking factors" to capture demand for each customer class and SFR tier. It said this method was discussed in the AWWA M1 Manual, and the "key assumption" was the "system must be built to . . . meet the demands of higher use customers." We describe HDR's peaking factor analysis *post*.

Addressing rate design, HDR stated the conservation tier was being eliminated, noting it was "put in place to encourage efficient use," but also addressed "affordability concerns"; "non-cost based pricing tiers were recently found (ruled) to be illegal," citing *Capistrano*; and the conservation tier resulted in "two different prices for essentially the same volume of

23

water . . . ." For the other tiers, HDR stated that based on "review of consumption data . . . the tier sizes, as determined and established in the 2013 Atkins analysis, remained relevant and appropriate." It noted a recent, severe drought impacted consumption, and both overall and Tier 3 water usage had declined. HDR also noted that "in a typical cost of service study," allocation factors generally reflect an entire class, and, in this study, "additional cost detail was needed . . . to justify the cost-basis" for the tiered rates. HDR determined the "current 1st and 3rd [SFR] tier pricing [was] too high, and the 2nd tier [was] below cost," and recommended revised pricing. It observed "high-use customers [would] see a reduction in their bill, primarily as a result of the reduction of the tail block price to a cost-based level."[12]

HDR also recommended other changes, including moving commercial and irrigation customers to uniform rates and modifying the basis for the system fee.

Otay reviewed HDR's recommendations at an April 2017 Board meeting. HDR representative Tom Gould addressed the rate study, and indicated residential customers were not moved to uniform rates because their rates "should encourage efficient use," including using pricing tiers to "encourage conservation." The Board subsequently approved the proposed rates.

### c. *Coziahr's Expert Evidence*

Coziahr's expert, Vondle, opined Otay's rate studies reflected its "rate-making method . . . was designed to promote conservation, not to allocate the proportional cost of water service" to different SFR tiers.

---

[12] By "tail block," HDR appeared to refer to the Tier 3, the last and highest tier in the SFR rate structure.

Regarding the 2013 rates, Vondle stated they were "clearly designed to promote conservation," noting HDR "explicitly recognized that the first tier rate was not cost based" and recommended eliminating it. He also noted the 2013 rate study used "exact percentages" from AWWA in setting rates, "indicat[ing] that Otay did not try to correlate its rates with the actual costs of service . . . ."

As for 2017, Vondle said it appeared HDR "introduced the theoretical 'peaking' concept to justify the tiered [SFR] rates," and he rejected that justification. Vondle noted HDR conceded "additional cost detail" was needed and opined it had not "developed any 'additional cost detail' through objective studies of the Otay water system."

d. *Otay's Expert Evidence and Coziahr's Critique of It*

Otay's expert, Mumm, opined both rate studies "result[ed] in a proportional allocation of costs among classes based on customer and demand-related factors," and Otay "immediately implemented" their findings. He also maintained Otay could and did "achieve a conservation-oriented rate structure within a cost-of-service framework . . . ." Regarding evidence to justify the different SFR tier prices, Mumm cited the "difference in peak requirements" and an "independent analysis" that he conducted (which found rates were materially proportional to costs).

Coziahr's expert, Vondle, disagreed Atkins used a peaking factor concept, noted Mumm focused primarily on the HDR study, and criticized Mumm's independent analysis.

e. *Statement of Decision*

The trial court determined Otay did not provide substantial evidence that its 2013 and 2017 tiered water rates were proportional to the cost of providing water service.

For 2013, the trial court indicated that at the time of the Atkins' rate study, Otay used an existing "four-tiered increasing rate structure" for SFRs. The court found Atkins' design considerations, including conservation, did not comply with constitutional limits. It cited HDR's recognition that the rate structure was " 'specifically designed to encourage conservation of water,' " and " 'created two different prices' " for the same water. It also noted Atkins' statement about limiting revenue recovery to 30 percent from fixed costs to "achieve 'conservation pricing' . . . ."

Addressing the tiers, the trial court found Otay "set the breakpoints to discourage high water use," because it assumed above-average use is "excessive use that should be penalized." It also found Otay merely "followed AWWA guidelines in setting Tier 2 exactly 30% higher than Tier 1, and Tier 3 at exactly 100% more than Tier 1," and adherence to industry standards was insufficient. It noted Atkins "candidly acknowledge[d]" the goal of dividing costs into base and extra capacity, and setting tiers below and above cost, was to "*promote conservation.*" It also found HDR admitted "higher-use customers had been charged more than the cost of service," citing its comment about reduction of the highest tier price to a cost-based level.

As for the 2017 rate study, the trial court found it was "also based on non-cost objectives such as conservation." The court stated that although HDR "eliminated the admittedly below-cost conservation tier, it did not address the underlying flaws" in the rate structure. Rather, it "kept the other tiers which are not cost-based"; "failed to address" if they were "proper based on the cost of . . . service"; and said only that it "reviewed the tiers," "adjusted the . . . levels based on average usage," and "otherwise left them in place." The court then found HDR "worked backwards to try to justify" the tiers with "AWWA's 'peaking factors' methodology," noting Vondle's view that

26

HDR failed to develop " 'additional cost detail' " through studies of the Otay system.

The trial court also found Otay engaged in differential treatment in violation of *Palmdale*, by moving customers other than SFRs to uniform rates (thus charging SFRs more for water); its peaking factor analysis was flawed; and Mumm's independent analysis did not support Otay's rates.

2. *The Trial Court Properly Relied on* Capistrano *and* Palmdale *to Find Otay Did Not Demonstrate at Trial That Its SFR Rates Were Constitutional*

Otay contends the trial court improperly relied on *Capistrano* and *Palmdale* with respect to: sufficiency of its proof, generally; conservation as a goal; use of the AWWA manual; and discrimination against SFR customers. We conclude the court's application of these cases was sound, and Otay's arguments lack merit.

a. *Lack of Support for Tiered Rates*

*Capistrano* upheld a Section 6(b)(3) determination against a water agency, because it had "to correlate its tiered prices with the actual cost of providing water at those tiered levels," and failed to do so. (*Capistrano, supra*, 235 Cal.App.4th at pp. 1506-1507.) The trial court found Otay similarly failed to establish such correlation, and the record supports this finding.

As in *Capistrano*, the trial court could impliedly find Otay's SFR tiered rate structure rested on nonspecific data and assumptions, rather than on the actual cost of providing water service to the parcel. (*Capistrano, supra*, 235 Cal.App.4th at pp. 1498-1499.) There, even though the consultant used "historical data of usage patterns" to set the tier structure, the court determined the agency "never attempted to justify its price points as based on *costs of service for those tiers*," as required, and merely "attribute[d]

27

percentages of total costs to the various tiers." (*Id.* at pp. 1499-1501, 1507; *id.* at p. 1499 [noting assumptions about indoor, outdoor, and excessive water use, and use of AWWA manual].)

Here, the 2013 Atkins rate study shows Otay kept an existing rate structure meant to promote conservation; Atkins set the SFR tier breakpoints based on assumptions about winter, summer, and excessive outdoor use; and it expressly acknowledged Tier 2 and 3 pricing would be set *above* average cost. The contemporaneous comments at the 2013 Board meetings from finance manager Bell and Atkins representative Keese confirmed conservation was the purpose of the tier structure, while CFO Beachem acknowledged Otay viewed paying higher rates on a large lot as a "lifestyle choice."

The 2017 HDR rate study maintained this conservation-focused structure, with the exception of folding the conservation tier into Tier 1 and stating it reviewed and confirmed the other tiers. Further, HDR representative Gould essentially admitted tiered residential rates were retained to encourage efficiency. HDR disclaimed water conservation was a rate design goal, but the trial court could impliedly reject this assertion as not credible.

Otay maintains its SFR tier "[b]reakpoints were set by analyzing data regarding Otay's residential customers' water use" in light of AWWA principles for "allocating the costs of peak demand," citing both rate studies. It also argues the rate structure was not meant to penalize consumption, citing language in the Atkins rate study about cost recovery. But the rate studies were before the trial court, and it found Otay's showing insufficient. (See *Morgan, supra*, 223 Cal.App.4th at p. 898.)

28

Also as in *Capistrano*, the trial court could impliedly find Otay's SFR rates reflected questionable consistency.  There, "fractional precision" between the tiers "suggested . . . [the agency] did not attempt to correlate its rates with cost of service," as "mathematical tidiness is rare in multidecimal-point calculations."  (*Capistrano, supra*, 235 Cal.App.4th at pp. 1504-1505.)  *Capistrano* noted this "conclusion was confirmed at oral argument," when the agency acknowledged it had not tried to correlate cost of service to pricing.  (*Id.* at p. 1505.)  Here, Atkins did not just use precise percentages.  Rather, as the trial court found, it merely "followed AWWA guidelines in setting Tier 2 exactly 30% higher than Tier 1, and Tier 3 at exactly 100% more than Tier 1," and had " 'no objective evidence' " based on Otay system data for the cost difference.  HDR did make rate adjustments, and aimed to justify the rates with a peaking factor analysis.  However, Coziahr's expert Vondle criticized that justification and, again, the trial court rejected it.  This rejection was supported by the record, as we discuss *post*.

Otay belatedly argues on reply that, unlike the agency in *Capistrano*, it has not conceded its rates did not reflect costs, and its "tiered rates did not utilize 'tidy' ratios and fractions, because [it] calculated the tiers using monthly customer use data."  Even if it had not forfeited these points (*Raceway, supra*, 2 Cal.5th at p. 178), we would reject them.

*Capistrano* said the agency's admission at oral argument "confirmed" its conclusion that the agency did not try to correlate the cost of providing service at various levels to prices at those levels.  (*Capistrano, supra*, 235 Cal.App.4th at pp. 1504-1505, 1508.)  Further, the rest of *Capistrano's* analysis makes clear the issue for the court was not just the lack of a pricing rationale, but also the lack of *evidence* supporting the agency's cost allocation.

(See *id.* at pp. 1497-1498 [agency must "calculate the actual costs" of service], 1507 [evidence "must . . . withstand independent review"].)

Otay's claim that it did not use " 'tidy ratios' " because it used monthly customer data also lacks force. The Atkins rate study used monthly data to set the SFR tier breakpoints, but then simply adopted formulaic AWWA pricing guidelines. In adjusting these rates, HDR used monthly data and AWWA methods to allocate purported peaking costs—but Coziahr's expert Vondle opined this showing did not suffice to establish peaking costs or their allocation, which the trial court could credit. We address HDR's peaking factor analysis further *post*. (*Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607 [" '[E]xpert opinions . . . are worth no more than the reasons and factual data upon which they are based.' "]; cf. *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2015) 237 Cal.App.4th 23, 32 ["Centex is alleging conclusions without substance, not facts. As Gertrude Stein famously said about Oakland, there is no there there."].)

b. *Focusing on Conservation Instead of Cost of Service*

Otay argues the trial court erred by relying on *Capistrano* and *Palmdale* to find it improperly promoted conservation. This argument lacks merit.

The agencies in both *Capistrano* and *Palmdale* cited their water conservation obligations under article X, section 2 of the state constitution in defending their rate structures. The courts rejected these arguments, making clear that constitutional obligations under article X, section 2, and article XIII D had to be harmonized. (See *Capistrano, supra*, 235 Cal.App.4th at p. 1510 ["nothing in article X, section 2, requires water rates to exceed the true cost of supplying that water, and in fact pricing water at its true cost is compatible with the article's theme of conservation with a view toward

30

reasonable and beneficial use"]; cf. *Palmdale, supra*, 198 Cal.App.4th at pp. 936-937 ["article X, section 2 is not at odds with article XIII D so long as, for example, conservation is attained in a manner that 'shall not exceed the proportional cost of the service attributable to the parcel' "].)

The trial court properly cited this reasoning in rejecting Otay's own reliance on article X, section 2, to argue its encouragement of conservation was proper. The court emphasized that section "*does not* excuse" compliance with Proposition 218, and confirmed Otay "cannot point to conservation as a justification" to exceed the cost of the service attributable to the parcel. It subsequently found "Otay and its consultants . . . ignored the key requirement of Proposition 218: setting the rates based upon the 'cost of service' . . . . Instead, the rates were set to send price signals or promote conservation . . . ." The court cited, inter alia, Vondle's observation that " '[c]onservation was a central tenet' " of the 2014-2017 rate structure.

Otay tries to distinguish *Palmdale*, arguing the consultants there "recommended two rate structures, one that emphasized conservation and the other that followed cost-of-service principles, and the agency chose the conservation structure." (*Palmdale, supra*, 198 Cal.App.4th at p. 937.) This is not an accurate description, and regardless, *Palmdale* noted the rejected rate structure *after* concluding the record failed to justify the agency's disproportionate rates for irrigation customers. (*Id.* at pp. 936-937; see *id.* at p. 937 [water district declined a cost of service option that sent a stronger conservation signal, but with more revenue fluctuation; option it chose sent a weaker conservation signal, with more rate stability].)

Otay also argues the "evidence confirms" it was "ensuring constitutional cost allocation[ ]" while pursuing conservation goals. It posits it "was promoting conservation *because* inefficient use . . . increases . . . costs

31

of service," and "[c]onservation was thus an incidental benefit of the tier structure." Otay's assumption that inefficient use increases costs of service is unsupported by the record citations it provides,[13] and its claims about its pursuit of conservation fare no better. The trial court found Otay prioritized conservation *instead* of costs. The record supports that finding, including the 2013 Atkins rate study and its intentional, above-cost tier pricing; HDR's retention of most of the existing conservation-focused tier structure; Vondle's expert opinion; and the Board meeting comments by finance manager Bell, CFO Beachem, Atkins representative Keese, and HDR representative Gould.

c. *Reliance on AWWA Manual Untethered to Actual Costs*

Otay contends the trial court improperly relied on *Capistrano* to criticize its consultants' reliance on AWWA's M1 Manual. Otay does not establish error.

In *Capistrano*, the agency's consultant applied the manual, which recommended a "work-backwards-from-total-cost methodology," but did not try to connect the water rates to the cost of service. (*Capistrano, supra*, 235 Cal.App.4th at pp. 1504-1505, 1514.) The court stated the "[M1] manual might show working backwards is reasonable, but it cannot excuse utilities from ascertaining cost of service now that the voters and the Constitution have chosen cost of service." (*Id.* at p. 1514.)

Citing the foregoing discussion, the trial court here stated "[a]dherence to industry standards . . . did not establish compliance with Proposition 218." The court applied this principle to criticize Atkins' lack of evidence for its

_____

13 Otay cites a page in the Atkins study discussing rate design, the introduction to the HDR study, and a page from 2008 Board minutes, where a consultant discussed peaking factors. We note amicus Mesa Water District contends tiered rates actually incentivize more water use, by pricing low-tier water below cost.

32

price differentials, also citing an observation from Vondle's reply declaration that Atkins followed the "generic guidelines from the AWWA" manual. Thus, the court's criticism was consistent with *Capistrano*, and supported by the record.

Otay tries to distinguish *Capistrano*, stating that use of the AWWA manual there was "untethered from constitutional cost-of-service principles," whereas here, Otay used the manual's "engineering principles to identify and allocate" costs, based on peak demands. The trial court considered the Atkins study, and found otherwise: specifically, that the study reflected mere adherence to industry standards, *not* evidence of actual costs of service. Although the court did not specifically criticize HDR's reliance on the AWWA manual, we can infer it was similarly critical of any prioritization of industry practice over the determination of the actual costs of providing water service.

Otay also argues California courts have "recognized that the [AWWA] M1 Manual provides relevant guidance" for ratesetting, citing *Griffith*, and that the manual "reflects the collected wisdom of . . . engineers around the country." *Griffith*, as noted, involved review of a judgment for the agency, and *Capistrano* appeared critical of its discussion of the use of the manual. (*Griffith, supra*, 220 Cal.App.4th at p. 600 [defendant relied on methodology recommended by AWWA M1 Manual]; *Capistrano, supra*, 235 Cal.App.4th at p. 1514 ["we certainly do not read *Griffith* for the proposition that a mere manual used by utilities throughout the western United States can trump the plain language of the California state Constitution."].) Further, the AWWA M1 Manual itself states tiered rates can "be more complicated to design" than other rates, and should be considered when an agency has the "analytical capability to design" them. The manual cautions tiered rates are a useful management tool "[w]hen *legally defensible*." (Italics added). The trial court

33

properly recognized that under California law, reliance on the AWWA M1 Manual, without more, is insufficient.

### d. *Unjustified Differential Treatment*

Otay argues the trial court erred in finding its rate tiers discriminated against SFRs, in violation of *Palmdale*. We are not persuaded.

### i. *Additional Facts*

In *Palmdale*, the water district's tiered rates were higher for irrigation customers, and the Court of Appeal held irrigators were being "charged disproportionate rates," without a "corresponding disparity" in costs. (*Palmdale, supra*, 198 Cal.App.4th at pp. 930, 934-937.)

Here, HDR's 2017 rate study determined a uniform rate structure (i.e., same price per unit, regardless of volume) was more appropriate for commercial and irrigation customers. HDR explained, in part:

> "The current structure for irrigation and commercial
> customers has very little difference in the pricing of tiers,
> which more closely resembles a uniform rate structure . . . .
> The use of a tiered rate structure in this manner adds a
> level of complexity . . . with no discernible benefit from a
> customer equity or conservation perspective."

HDR subsequently stated that "[m]ovement to a uniform rate structure for commercial and irrigation would seem to offer a number of benefits including ease of customer understanding, ease of rate administration, and a greater ability to legally defend the rates, particularly as it relates to the pricing of the tiers."

HDR also elaborated on commercial and irrigation usage patterns, as compared to residential customers. According to HDR, residential customers "have fairly similar consumption patterns," whereas commercial usage "can vary significantly" and "high volumes of use do not necessarily signify inefficient or wasteful use." As for irrigation customers, HDR said "there

34

certainly can be inefficient . . . use, but most large irrigation customers manage their usage carefully" and there are "other means . . . to encourage" efficient use.

HDR representative Gould's comments at the April 2017 Board meeting are pertinent here, and we expand on them. A director asked why a uniform rate was proposed only for nonresidential customers. Gould stated that "with residential customers, the rates should encourage efficient use," as the "philosophy of tiered rates is to provide efficient users with a cost based rate, but also price tiers for inefficient users to encourage conservation." He further stated a uniform rate for residential users would "provide a significant benefit to the larger users and could encourage more water use," while causing "more impact[ ]" to low water users. He said that if Otay "would like to move to a uniform rate for residential users," it "could slowly collapse the tiers."

The 2018 uniform rates for commercial and industrial customers ($3.61 and $5.27, respectively) fell between the rates for 2018 SFR Tier 1 ($3.05 for 0-10 HCF) and Tier 2 ($5.44 for 11-22 HCF). SFRs thus paid more for water use above 10 HCFs (i.e., SFR Tiers 2 and 3).

In the Statement of Decision, the trial court determined that, in the "same flaw" as in *Palmdale*, Otay "discriminated against [SFR] customers" by charging them more for water by tier "than other classes of customers . . . who are charged a flat rate." The court found Otay "has not provided any cogent reason for this differential treatment, and none is apparent in the record given that the water sources and cost of delivery appear to be the same." The court further found the "only explanation in the record is that Otay decided to keep non-cost-based rates for residential customers to 'encourage efficient use,' " citing Gould's comments.

35

ii. *Analysis*

*Palmdale* stands for the proposition that rate differentials between groups, whether customer classes or tiers, support an inference of disproportionality—and, to be constitutional, must be supported by evidence of costs justifying the differences. (*Palmdale, supra*, 198 Cal.App.4th at p. 934; *Campana v. East Bay Municipal Utility Dist.* (2023) 92 Cal.App.5th 494, 497 [*Palmdale* held Prop. 218 requires agencies using a "tiered-rate water structure to be able to prove that charges assessed at the various tiers are proportional" to costs of service to each parcel]; *Capistrano, supra*, 235 Cal.App.4th at p. 1507 [recognizing *Palmdale* was "primarily focused on inequality between classes of users," but applying it to tiers].) Here, the trial court properly relied on *Palmdale* to find Otay kept SFRs in tiered rates, despite moving others to uniform rates, to encourage SFR water use efficiency—further undermining Otay's showing under Section 6(b)(3).

Otay does not establish this reliance was inappropriate. Otay's position is that "HDR explained its reasons for eliminating tiers for non-residential customers," and the trial court was "simply wrong to perceive this change" as discriminatory. But the court could, and did, find HDR's explanation inadequate to justify charging SFRs more for the same water than other customers. HDR, and its representative Gould, focused on multiple reasons unrelated to cost of service, including not only water use efficiency, but also equity and legal defensibility. Indeed, by conceding that water use of irrigation customers "certainly can be inefficient," but there are "other" ways to encourage their efficiency, HDR drew the kind of arbitrary distinction *Palmdale* rejected. (See *Palmdale, supra*, 198 Cal.App.4th at p. 937 [observing other customers could waste outdoor water "by, for example,

36

filling, emptying and refilling a swimming pool or excessively hosing off a worksite or parking lot," without the same cost].)[14]

  3.  *The Trial Court Properly Rejected Otay's Peaking Factor Justification on This Record*

We now turn to Otay's asserted justification for its SFR tiered rates: that its consultants used peaking factors (i.e., ratios meant to capture peak versus average demand) to allocate costs. Coziahr's expert disputed this explanation, and the trial court found no support for it. Otay does not establish reversible error on this basis, either.

  a.  *Additional Facts*

The 2013 Atkins rate study did not expressly apply a peaking factor analysis. In addressing the design of the SFR tiered rates, it cited the use of the AWWA base-extra capacity method; claimed above-average use involves a "larger portion" of the water system; and said systems had to be designed for "peak . . . use," but it did not identify peaking factors or describe any allocation of costs to base or extra capacity categories. At the February 2013 Board meeting, finance manager Bell said Otay "uses [AWWA] Standards . . . when determining 'peaking' costs." Atkins representative Keese explained "peaking" was the "sizing of [Otay's] infrastructure . . . to handle the highest water use," noting residential use was "highest in the morning and evenings . . . ."

---

14   Otay claims on reply that it properly prioritized both costs and conservation for SFRs, and costs alone for others; even if not forfeited, Otay is essentially just asking us to reweigh the evidence. For his part, Coziahr argues that Otay violated *Palmdale* in a second way: using the unsupported peaking factor analysis to allocate the revenue requirement to customer classes, thus "taint[ing]" total SFR revenue collection. Having concluded the trial court's express findings under *Palmdale* are supported by the record, we need not reach this additional point.

In its 2017 rate study, HDR indicated it applied peaking factors at both the cost of service and ratesetting steps.  For cost allocation, it developed the "base allocation factor . . . using FY 2015 consumption" for each class.  As "measured data was not available," the "average month to peak month data was used as a reasonable surrogate (estimate) for the peak day characteristics of each class of service."  A "similar approach" was used for peak hour.  For ratesetting, HDR stated that "only the peak day extra-capacity cost classifier was utilized."  It explained a "slightly different approach was used to determine the peaking factors by tier," wherein the "average of peak month to average month" was calculated by tier.  Peaking factors were then "adjusted to reasonably tie to [Otay's] actual system peak demand."

Vondle opined there was no evidence Otay "determined actual peaking costs" and allocated them to "customers actually causing" increased system costs.  Vondle opined the 2013 Atkins study "did not use a 'peaking factor' concept" at all.  For HDR, Vondle said its peaking factor justification was "not . . . objective and defensible . . . ."  He said HDR "arbitrar[ily] misallocat[ed]" expenses as extra capacity costs, such as bulk water purchases, and that "without time-of-use meters," Otay had no way to identify customers with higher use periods.  He contrasted this with electrical utilities, where there was a "legitimate higher cost of 'peak' use," and they used time-of-use meters to allocate costs based on particular customers' energy use.  Vondle further opined the "costs of the larger [water] system capacity built for use in higher use periods is recovered in the fixed charges," and capacity costs are "appropriately recovered" from those charges, and not the variable rates.

38

Mumm disagreed with Vondle.  Among other things, he maintained Atkins introduced the "concept of peak demand, characterized . . . by peaking factors," citing its use of AWWA standards to allocate costs.

The trial court rejected Otay's peaking factor justification.  It found Atkins made "no attempt" to show higher-tier usage occurred at peak times or used a "larger portion of the water system," noting Vondle's opinion that "Atkins did not use a 'peaking factor' concept in calculating the rates.' "  The court disagreed with Mumm that Atkins focused on peaking costs, stating he "cite[d] nothing in the Atkins report to support his speculation."

The trial court then found HDR's "peaking analysis [was] flawed for two main reasons."

First, it found the record had no "evidence that there is a difference in the cost of water used during high-use or low-use times."  It noted the costs categorized as extra capacity, such as water purchases and infrastructure, were "not disproportionately greater" for larger volumes.  Rather, Otay "already recover[ed] most of these costs through other line items," showing they are fixed and cannot justify "disproportionately higher rates for the higher tiers."

Second, the trial court found Otay "does not collect time-of-use data," and thus "does not—and cannot—charge customers more based on when they use water . . . ."  It noted Vondle's comparison of "Otay's system to a true peaking system, such as an electrical utility . . . ."  The court also noted Keese conceded "peak use depends on *when* the water is being used," not "*overall quantity* . . . ."

      b.  *Analysis*

Otay does not establish the trial court erred in rejecting its peaking factor justification for the SFR rate structure.

39

For the 2013 ratemaking, Otay argues that "[w]hile it is true that Atkins did not use the phrase 'peaking factors,' its analysis objectively utilized those principles," and the trial court misunderstood the facts in finding otherwise. We disagree. The Atkins rate study addressed peak demand in general terms, including by reference to the AWWA manual, as did finance manager Bell and Atkins representative Keese. Although Otay's expert Mumm opined use of AWWA standards sufficed to introduce the "concept of peak demand, characterized . . . by peaking factors," Coziahr's expert Vondle disagreed, and the court could and did reject Mumm's opinion. (Cf. *City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 121 (*San Buenaventura*) [Prop. 26 case, where "parties produced considerable expert evidence to support their positions"; "[i]t is not our role to . . . reassess the strength of the experts' opinions"].)

Otay also does not show the findings on HDR's peaking analysis in 2017 were unsupported by substantial evidence. As noted, the trial court found two main flaws with the consultant's analysis: Otay did not establish that peaking-related costs existed, or have data to allocate them.

Otay disputes the trial court's finding that most costs categorized as extra capacity were actually fixed costs. It argues that although it "recovers a *portion* of its fixed costs from fixed rates," it obtains the "*majority* of fixed costs, including those impacted by the need to meet peak demands, from . . . volumetric rates." However, Otay's admitted collection of *some* fixed costs from fixed charges reflects such costs are not necessarily related to peak demands. Further, the Atkins rate study indicated Otay limited revenue recovery from fixed charges to 30 percent for conservation pricing purposes. This evidence supports an inference that Otay *chose* to recover certain fixed costs from variable rates—not because it had to account for peaking.

40

Otay also argues its use of "data connecting customers' seasonal patterns of use to peak demands" and "reasonable estimates" was sufficient to support its peaking analyses, citing *Morgan*, and that the trial court erred by adopting Vondle's opinion that it could not use a peaking justification without time-of-use data. Otay suggests, in substance, that the trial court was required to accept its position on this key factual dispute (i.e., whether its evidence for its peaking factor justification was adequate). Otay is essentially asking us to reweigh the evidence and reach a different factual conclusion, which we cannot do. (*Morgan, supra*, 223 Cal.App.4th at p. 916; *Howard, supra*, 72 Cal.App.4th at p. 631.)

Moreover, the record supports the trial court's finding that Otay lacked data to allocate peaking costs. HDR acknowledged it used monthly data in the absence of "measured data," along with AWWA methods, and Vondle opined this evidence was not sufficient (stating there was *no* evidence for the existence or allocation of peak costs, not simply no time-of-use data, in contrast to electrical utilities). The trial court was entitled to accept Vondle's view. *Morgan* does not aid Otay, as that case did not address peaking and, again, there we were reviewing a judgment in favor of the agency with the concomitant appellate presumptions. (See *Morgan, supra*, 223 Cal.App.4th at pp. 899-900.)[15]

Finally, and more generally, Otay suggests that the trial court did not understand peaking is an analytical concept that "systems must be built to

_____

[15] To the extent the trial court could be seen as requiring time-of-use data (as Otay suggests), we note Section 6(b)(3) does not require or bar use of any particular type of supporting data, so long as it meaningfully reflects cost of service to the parcel. But once experts have weighed in, as here, it is for the trial court to decide whether the showing meets the constitutional cost of service standard. (*San Buenaventura, supra*, 79 Cal.App.5th at p. 121.)

accommodate peak demands," not a literal time of day.  To the contrary, the court recognized that, according to the HDR rate study, "*theoretical* costs associated with 'peaking' relate to *when* customers choose to use their water . . . ."  (First italics added, second italics in original.)  This was consistent with HDR's own explanation:  that a system must be able to supply water at the "time of greatest demand," known as "peak demand."[16]

4.  *The Trial Court Properly Rejected Mumm's Analysis*

Finally, Otay contends the trial court "concluded that Otay's approach was undermined" by part of Mumm's independent analysis, but the court misunderstood the analysis.  Otay does not establish the court erred in rejecting Mumm's analysis.  (*Howard, supra*, 72 Cal.App.4th at p. 632 [" 'expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary' "].)

Mumm conducted an "independent evaluation of [Otay's] water rates," using billing records and peaking factors.  For the Atkins period, he developed his own factors, and for the HDR period, he used theirs.  He compared the "average cost per unit of demand" for water to the "average effective rate per unit" for SFRs and found there was "no material difference."  In his analysis, Mumm discussed "total cost[s]" at various points, and also noted that "[b]ecause a portion of every customer's service is a fixed cost," the "initial unit cost is high but decreases as the fixed cost is divided among more . . . units," until "average cost starts to increase" due to peak capacity.

Vondle opined that Mumm's analysis "does not show that HDR's cost allocation method is correct; it only shows that Mr. Mumm's cost allocation

---

16   We deem forfeited additional points that Otay raises on reply regarding its peaking factor justification, including as to expert evidence.  (*Raceway, supra*, 2 Cal.5th at p. 178.)

methodology is the same as HDR's" and because they both "use the same flawed cost allocation . . . both are incorrect."

The trial court found Mumm's analysis did not support Otay's rates for several reasons. First, the court found Mumm's analysis is "flawed because it is based on the same faulty assumptions as the HDR Report. . . ." Second, it found his "approach . . . is little more than post-hoc rationalization," much of which "simply does not match" the record. As for the court's other findings, it viewed Mumm's approach as being contrary to *Capistrano*, which held an agency must " 'do more than merely balance' " total costs with revenues. (*Capistrano, supra*, 235 Cal.App.4th at p. 1506.) Citing Mumm's observation that cost-per-unit decreases as demand increases, it found this "undercut[ ] Otay's sole justification" for its rates (i.e., greater volume means higher costs). Lastly, it found Mumm's approach was "inconsistent with customers' experience" of being "charged more for water in higher tiers" without a "cost basis."

The trial court's key findings—that Mumm basically replicated the flawed HDR study, and provided an unsupported, post-hoc rationalization— are consistent with the record, and support the court's rejection of his analysis without more. Mumm relied on monthly billing records, like HDR; he applied peaking factors used by HDR (and factors that he developed for the Atkins period); and he concluded the resulting costs were consistent with the consultant-proposed rates.[17]

_____

[17]    Otay's arguments here, which concern the trial court's other findings, also lack merit. First, Otay claims the court "misread[ ]" Mumm's decreasing-costs discussion, stating his point was that "fixed costs go[ ] down if more units are delivered," while peaking implicates increased system costs. To the extent the court was imprecise here, it is understandable. As noted, Otay chose to recover some fixed costs through fixed rates, and some through variable rates supposedly based on peaking, so Mumm's distinction is not

43

In sum, Otay did not establish the SFR tiered rates it set during its 2013 and 2017 ratemaking processes were compliant with Section 6(b)(3). We affirm the trial court's liability determination.

## II. *Parties' Appeals Regarding the Refund*

Both parties assert error as to the refund award. For purposes of these appeals, they appear to agree that if a refund is available under Section 6(b)(3), the measure is the difference between (a) a constitutional rate, and (b) what Otay charged class members. However, Otay's appeal raises three fundamental questions: whether a monetary remedy was available in the first place; if so, whether there was evidence of damages here; and, if so, whether the refund calculations were reasonable. Coziahr's cross-appeal challenges only the trial court's inclusion of water charges at all SFR tiers in the refund calculation. We conclude that a refund was available, and the trial court's only error was in using unreasonable calculations.

## A. *Additional Facts*

During the Phase II damages proceedings, Coziahr and Otay submitted briefs addressing proposed refund calculations, supported by expert declarations from Vondle and Mumm respectively. Vondle offered multiple alternatives, all of which resulted in refund awards; Mumm's calculations resulted in a classwide undercharge. The trial court held a Phase II hearing, at which it heard argument from counsel.

---

obvious. Second, Otay claims the court erroneously rejected his analysis for "advocating . . . a 'total cost' approach," stating that although he discussed total costs, his conclusion was that costs were proportionally allocated. The court could fairly cite *Capistrano* to criticize his total costs discussion. (See *Capistrano, supra*, 235 Cal.App.4th at p. 1506 [agency had to "do more" than balance total costs and revenues].)

The trial court issued another statement of decision for Phase II, stating it already found damages at Phase I; setting forth its refund calculation approach, which included all SFR water charges in the calculation; and indicating it would hold an individual allocation phase. The court then entered judgment, awarding an estimated class refund of around $18 million that increased monthly until compliance. It also awarded prejudgment interest, said plaintiffs were the prevailing parties, and retained jurisdiction to hear an attorney's fee request.

B. *Applicable Law*

"An appellant's challenge to damages, depending upon its specific nature, may be subject to a substantial evidence, abuse of discretion, or de novo standard of review." (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 583 (*JMR*).)

The "question of whether a plaintiff was, in fact, damaged by the defendant's [conduct] is reviewed for substantial evidence." (*JMR, supra*, 243 Cal.App.4th at p. 583.) A "party claiming damage must prove that he has suffered damage and prove the elements thereof with reasonable certainty." (*Carpenter Foundation v. Oakes* (1972) 26 Cal.App.3d 784, 799.) " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774 (*Sargon*) [law "requires only that some reasonable basis of computation of damages be used"].)

The issue of whether a "certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843; see *Greene v. Marin County*

45

*Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287 [legal questions regarding Prop. 218 are reviewed de novo].)  A court's "choice among several legally permissible measures of damages, under the specific circumstances of the case, is a matter of discretion." (*New West*, at p. 843.)

Additionally, "[d]amages must, in all cases, be reasonable . . . ." (Civ. Code, § 3359; accord, *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 738 (*Atkins*).)

C.  *A Refund Remedy Is Available for a Section 6(b)(3) Violation*

Otay argues that monetary relief is unavailable under Section 6(b)(3). We disagree.  As we shall explain, a refund may be awarded pursuant to a mandate claim, and Otay establishes no grounds to limit such relief here.

1.  *Additional Facts*

Prior to commencing this lawsuit, Coziahr sent a notice of government claim to Otay, which Otay rejected.  Coziahr then filed his complaint, which included claims for restitution damages based on excessive fees, and a writ of mandate pursuant to Code of Civil Procedure section 1085 compelling Otay to reimburse unlawfully collected fees, among other things.  His prayer for relief included damages and "[r]estitution . . . or reimbursement" pursuant to "all applicable laws . . . ."  Otay pled affirmative defenses that the claims were barred under the Government Claims Act, and plaintiffs were "not entitled to equitable relief insofar as they have adequate remedies at law."

After Coziahr obtained class certification, Otay moved to set the statute of limitations to one year before Coziahr's lawsuit, based on the Government Claims Act.  The parties jointly stipulated to a one-year statute of limitations. The parties also entered a stipulation on trial structure, which said that if the court granted the petition for writ of mandate, the parties would "undertake a second phase related to remedies/restitutionary relief."

46

The Phase II Statement of Decision and judgment directed Otay to refund overcharges, but did not specify the cause or causes of action to which the directive pertained.

Otay filed an opposed motion for new trial, asserting Section 6(b)(3) did not authorize a refund, and that under *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300 (*Katzberg*), there was no damages remedy for this kind of constitutional violation. Otay also objected to the judgment on this basis. The court summarily denied Otay's motion and overruled its objection.

2.  *Summary of Katzberg*

In *Katzberg*, a public university professor sought damages for the university's failure to provide a "name-clearing" hearing after his removal from a department chairmanship, which he claimed was a violation of his due process liberty interest under the state constitution. (*Katzberg, supra*, 29 Cal.4th at p. 303.) The California Supreme Court set forth a framework to assess if an "action for damages is available to remedy a constitutional violation that is not tied to an established common law or statutory" action. (*Id.* at p. 303, fn. 1; *id.* at p. 317 [if no affirmative intent to permit or preclude damages appears, relevant factors are "whether an adequate remedy exists"; "extent to which a constitutional tort action would change established tort law"; and "nature and significance of the constitutional provision"; if factors support damages, court further considers "any special factors counseling hesitation"].) Applying this framework, the Court held there was no "constitutional tort cause of action for damages" to remedy the asserted due process liberty interest violation, and the plaintiff could not pursue a direct action for damages. (*Id.* at pp. 326-329.)

47

Pertinent here, the Court noted that "had plaintiff timely sought a writ of mandate under [Code of Procedure] section 1085 and prevailed in that action, [he] might have been entitled to obtain damages . . . pursuant to . . . section 1095." (*Katzberg, supra*, 29 Cal.4th at p. 326, fn. 27.)

3. *The Class Could Obtain a Refund for Otay's Section 6(b)(3) Violation Via Coziahr's Mandate Claim*

We reject Otay's belated challenge to monetary relief based on *Katzberg*. The parties have not identified, and our independent research has not disclosed, any cases deciding whether monetary remedies are available under Proposition 218. Coziahr contends a "writ of mandate directing an agency to refund fees" is appropriate. Otay acknowledges this argument (while listing Coziahr's points and stating they lack merit), but offers no substantive response. Without foreclosing other potential grounds for monetary relief, we conclude a ratepayer can obtain a refund for a Section 6(b)(3) violation via a petition for writ of mandate.

First, as the California Supreme Court acknowledged in *Katzberg*, damages may be available for a constitutional violation pursuant to a mandate claim. (*Katzberg, supra*, 29 Cal.4th at p. 326, fn. 27; see Code Civ. Proc., § 1095 [judgment granting a writ of mandamus may allow petitioner to "recover the damages which [the petitioner] has sustained"]; *ibid*. [damages "shall be paid as other claims against a public entity are paid"].)

Consistent with this principle, one Court of Appeal has recognized a refund may be available to a plaintiff who secured mandamus relief for a Proposition 218 violation. (*Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450, 1453-1454, 1463-1469 [reversing denial of preliminary injunction requiring city to cease groundwater production or pay assessment; although another court granted mandamus relief under Prop. 218, a damages phase remained pending and

48

the "amount . . . to be invalidated, if any, ha[d] not been determined"].)
Another Court of Appeal affirmed the grant of a writ of mandate and refund
order in a Proposition 26 case (albeit without analysis of the refund
component). (*Newhall County Water Dist. v. Castaic Lake Water Agency*
(2016) 243 Cal.App.4th 1430, 1433, 1439-1440 [affirming grant of writ
petition finding Prop. 26 violation and order for agency to revert to prior
rates and refund the difference with challenged rates].)

We see no principled reason why a trial court would be foreclosed from
including a refund in mandamus relief under Section 6(b)(3).

Second, Otay offers no substantive argument that the trial court was
unable to grant a refund pursuant to Coziahr's mandate claim, and forfeits
any challenge in this regard. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.)
We would reject it regardless. Coziahr pled a Code of Civil Procedure section
1085 mandate cause of action, which asked that Otay be compelled to
reimburse unlawful fees. The parties' trial structure stipulation then stated
that if the trial court granted Coziahr's mandate petition, they would proceed
to "remedies/restitutionary relief." The case did proceed to a remedy phase,
where the trial court awarded a refund. Although the court did not specify
the basis for the refund, we infer it relied on available grounds—which
included Coziahr's mandate claim. (See *In re Marriage of Arceneaux* (1990)
51 Cal.3d 1130, 1133 (*Arceneaux*) ["A judgment . . . of a lower court is
presumed to be correct on appeal, and all intendments and presumptions are
indulged in favor of its correctness"].)

4. *Otay Does Not Establish* Katzberg *Precluded the Refund*

Otay argues that "monetary damages, like refunds, are rarely available
for [state] constitutional violations" and *Katzberg* "devised a framework to
identify those rare circumstances in which they are." But *Katzberg* involved

49

a claimed due process liberty interest violation, and the framework was to identify when a "tort cause of action for damages" was available. (*Katzberg, supra*, 29 Cal.4th at p. 327.) The Court did not address refunds—or fees, charges, or assessments, generally. Indeed, Otay identifies *no* cases applying *Katzberg* to bar refunds for local government levies, under Proposition 218 or otherwise.

Coziahr contends "this makes sense," because "*Katzberg* only applies if there is no other path to a remedy," and under Proposition 218, a refund is authorized by the Government Claims Act (the Act) and recoverable in mandate. The Act "established a standardized procedure for bringing claims against local governmental entities," including claims presentation requirements. (*Ardon v. City of Los Angeles* (2011) 52 Cal.4th 241, 246 (*Ardon*); accord, *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 618-619 (*McWilliams*); see Gov. Code, § 910 [contents of claim].)

Monetary relief under Section 6(b)(3) is consistent with the Act. A mandate claim, which we already determined can support a refund, is subject to the Act if money is sought. (*Sparks v. Kern County Bd. of Supervisors* (2009) 173 Cal.App.4th 794, 798.) The California Supreme Court also has made clear the Act may be an avenue for a refund, in the absence of a specific refund procedure for a "local 'tax, assessment, fee, or charge.' " (*McWilliams, supra*, 56 Cal.4th at p. 621; *id.* at p. 629 ["except as to '[c]laims under the Revenue and Taxation Code or other statute prescribing procedures for the refund . . . of any tax," the "Legislature has determined that the . . . Act applies"]; *Ardon, supra*, 52 Cal.4th at p. 251 [a "class claim . . . for a tax refund against a local governmental entity is permissible" under the Act "in the absence of a specific tax refund procedure . . . in an applicable governing claims statute"].) And courts have applied the Act's requirements to

50

Proposition 218 actions seeking refunds. (See, e.g., *Plata v. City of San Jose* (2022) 74 Cal.App.5th 736, 748-749 [claim did not include Section 6(b) allegations]; *Daneshmand v. City of San Juan Capistrano* (2021) 60 Cal.App.5th 923, 937 [untimely claim].)[18]

Addressing issues implicated by the *Katzberg* framework, Otay argues, inter alia, that a refund was not contemplated by Proposition 218, not a necessary remedy under it, and contrary to public policy. These points lack merit. Otay contends that because the ballot materials do not reference damages, this "suggests no monetary remedy was intended." But Otay does not establish those materials mention declaratory, injunctive, or mandate relief either. (*Katzberg, supra*, 29 Cal.4th at p. 320 ["[T]here is nothing to suggest that the issue [of damages] was considered at all."].) Otay next contends these other forms of relief are sufficient. *Katzberg* was *about* damages, implying nonmonetary relief does not always suffice. For example, nonmonetary relief would not compensate SFR class members who are no longer Otay customers. As for public policy, Otay claims in part that the refund "cost . . . devolves" to ratepayers. All judgments against public entities may impact revenues, hence the bar on punitive damages against them, but such actions remain cognizable. (See *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1196, fn. 20 [describing purpose for punitive damages bar]; cf. *Ardon, supra*, 52 Cal.4th at p. 252 [policy "favoring

---

18     We thus also reject Otay's claim that when no "provision authorizes a refund," courts "bar such relief." Otay cites *Capistrano Beach Water Dist. v. Taj Development Corp.* (1999) 72 Cal.App.4th 524, which involved a statutory *exclusion*, and is inapposite. (*Id.* at p. 526 [challenge to sewer connection fee/capacity charge; no refund available, where fees at issue were excluded from refund provisions (see Gov. Code, § 66013, subd. (h))].)

51

fiscal responsibility . . . does not justify precluding legitimate class proceedings for the refund of allegedly illegal taxes"].)[19]

Finally, Otay contends that "allowing a refund creates a problem of proof." According to Otay, because calculating damages "requires a comparison of the rate paid against the amount that should . . . have been charged," this compels courts to "determine . . . a lawful rate" and "act[ ] as super-rate-setters"—and, as they cannot do so, courts have "no basis upon which to calculate damages." We disagree. The purpose of Phase II was to calculate a refund remedy, not set rates, and both parties offered expert damage calculations. The cases cited by Otay merely support using a refund measure based on comparing a lawful rate and the charged rate, which the trial court did here. (See, e.g., *Macy's Dept. Stores, Inc. v. City and County of San Francisco* (2006) 143 Cal.App.4th 1444, 1451-1452, 1454-1455 [reversing full refund of local business taxes, for an "amount sufficient to cure the discriminatory effect"].)

---

[19] Otay further claims the Legislature showed "it agrees prospective remedies are appropriate," by its later enactment of a water rate validation statute. (Gov. Code, § 53759; Stats. 2021, ch. 216, § 1.) On our own motion, we take judicial notice of the legislative history solely to observe that, if the bill is pertinent at all, it seems to support Coziahr's position. The history indicates "[e]xisting law" "[p]rovides a procedure for seeking a tax refund" (e.g., Assem. Com. on Local Gov., Analysis of Sen. Bill No. 323 (2021-2022 Reg. Sess.) Jun. 9, 2021), at one point citing article XIII, section 32 and the Government Code for this procedure. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 323 (2021-2022 Reg. Sess.) Apr. 20, 2021; see also Assem. Com. on Judiciary, Analysis of Sen. Bill No. 323 (2021-2022 Reg. Sess.) June 22, 2021 [bill sponsor Association of California Water Agencies (ACWA) and supporting agency coalition stated "existing law allows lawsuits that seek refunds"].) We note the local agency amici, including ACWA, claim here that a Proposition 218 "refund . . . is unavailable under existing law . . . ."

D. *The Record Supports the Existence of Damages*

Next, Otay contends the trial court "skipped the . . . step" of assessing whether Coziahr established damages, and there is no evidence of damages regardless. These contentions lack merit.

As a preliminary matter, we disagree with Otay that the trial court failed to make a damages finding. Otay claims the court erroneously found in its Phase II Statement of Decision that it "already determined" the fact of damages in Phase I. Otay asserts the court only found the rates were unconstitutional at Phase I, not that they caused financial loss. Whether or not the court found damages earlier, the court's Phase II finding reflects it *did* find damages existed. Further, Otay did not object to this aspect of the statement of decision, so we would imply factual findings necessary to support the judgment, regardless. (*Arceneaux, supra*, 51 Cal.3d at pp. 1133-1134.)[20]

Turning to the record, Otay does not establish the damages finding was unsupported by substantial evidence. As the trial court found at Phase I, the 2013 Atkins rate study set water rates for Tiers 2 and 3 above the average cost of water, HDR admitted high-tier customers had been charged above cost, and HDR left that rate structure substantially in place. After 2017, Otay also charged higher-tier SFRs more for water than commercial and irrigation customers. Customers who were overcharged presumptively had monetary damages, unless undercharges negated them. (See *Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302-1303 [drawing distinction

---

[20] Otay's objections to the proposed judgment are in the record, and they address refund availability and prejudgment interest. The register of actions shows Otay also filed objections to the Phase II Statement of Decision. We take judicial notice on our own motion to note these objections were limited to the issue of refund availability.

between the fact of harm, and the amount of damages]; cf., e.g., *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706 [damages based on overcharged taxi rides].) And the Phase II calculations of Coziahr's expert, Vondle, showed class members sustained monetary damages, even when accounting for undercharges. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873-874 (*GHK*) [substantial evidence "support[ed] the trial court's finding that GHK was in fact damaged by the breaches of the agreements"]; cf., e.g., *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1322-1323 [expert testimony on lost earning capacity provided substantial evidence for damages award].)

Otay's arguments do not compel a different result.

First, Otay contends that overcharging does not necessarily cause damage. Rather, Otay argues, some customers never "reach[ ] an overpriced tier" or never do so "enough to have net loss," and "Mumm's analysis reveals . . . the actual experience of the [c]lass members" fits into these categories. But Mumm used classwide data, so it is unclear how his analysis could reveal anything about individual class members. Otay essentially asks us to assume *no customer* used enough overpriced water to sustain economic loss—an inference *against* both the trial court's Phase II damages finding and the judgment. We cannot do so. (Cf. *GHK, supra*, 224 Cal.App.3d at p. 874 ["To accept appellants' argument. . . that [respondent] suffered no loss . . . would require this court to reweigh the evidence and reverse the trial court's factual findings, because [it] found, as a factual matter . . . that [respondent] had been damaged" (italics omitted)].)[21]

_____

[21]    Otay cites Coziahr as someone who did not use enough high-tier water to incur net loss, citing the declaration of Otay Assistant Chief of Finance, Kevin Koeppen. But Koeppen stated Coziahr *would* have damages under two Vondle approaches (and no damages under two others).

Second, Otay argues Vondle's opinion did not "meet minimum standards for proving damages." The record shows Otay unsuccessfully moved to exclude his testimony. Otay does not address this ruling, and does not show it was an abuse of discretion. (*Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 262-263 [where district made "no effort" to show denial of motion to strike expert testimony was an abuse of discretion, the reviewing court "must presume" the trial court properly denied the motion and considered the testimony].)

Otay relatedly argues the trial court "tacitly acknowledged" Vondle's calculations "lacked the certainty required to prove the fact of damages" by describing them as "merely sufficient" to show the measure of damages. Otay misstates the record. In the Phase II Statement of Decision, the court rejected Otay's argument that no overcharge amount could be determined. Instead, the court noted that "where the fact of damages is clear, *as it is here*" (emphasis added), the "amount . . . need not be calculated with absolute certainty," and used Vondle's calculations in setting the refund.

E. *The Trial Court's Refund Calculations*

Coziahr argues the trial court erred by including all charged amounts in the refund calculation, not just overcharges, which he contends amounted to an unpled offset without legal or equitable justification. Otay objects, in part, that the court unreasonably relied on projections and estimates based partially on a different case. We reject Coziahr's argument, but conclude these objections by Otay have merit and a new trial on the refund amount is necessary. We need not and do not reach Otay's remaining contentions regarding the refund and related amounts.

55

1. *Coziahr Does Not Show Including Undercharges Was Error*

The trial court impliedly rejected Coziahr's view that including all charges in the refund calculation amounted to an unpled offset.  That rejection was sound.

a. *Coziahr Does Not Show the Refund Involved an Unpled Offset*

Setoff is a defense "founded on the equitable principle that 'either party to a transaction involving mutual debts and credits can strike a balance, holding himself owing or entitled only to the net difference . . . .'" (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 (*Granberry*).)  Code of Civil Procedure section 431.70, which now codifies setoff, "authorizes a party who has been sued and has a 'cross-demand[ ] for money' against the plaintiff to 'assert in the answer the defense of payment.'" (*David S. Karton, a Law Corp. v. Musick, Peeler & Garrett LLP* (2022) 83 Cal.App.5th 1027, 1041.)

Here, Coziahr's expert, Vondle, opined the "overcharges are the difference between the rates paid by [SFRs] and the cost of water in Tiers 2 and 3," while Otay's expert, Mumm, asserted "net damages . . . must include both under and over billing . . . ."  Coziahr then argued in his Phase II briefing that including lower-tier charges would amount to an unpled offset and retroactive ratemaking.  At the Phase II hearing, Otay denied its calculation involved a setoff affirmative defense, as in a contract or tort case.  The trial court impliedly rejected Coziahr's argument by using an all-charges refund approach (while elsewhere criticizing Otay's classwide approach to net damages, and indicating refunds would be calculated individually).  Coziahr does not show this rejection was erroneous.

First, Coziahr argues the right to an offset applies when the parties have "mutual debts and credits" and "may assert cross-demands for money," summarizing offset principles from *Granberry* and elsewhere.  (See

56

*Granberry, supra*, 9 Cal.4th at pp. 741-744 [class action by former tenants against a landlord regarding security deposits].) Unlike *Granberry*, this dispute does not involve a private transactional relationship, or debts and credits. Rather, this is a ratepayer action in which the trial court determined at Phase I of the trial that Otay was liable to the class for failing to demonstrate that "its 2013 and 2017 tiered water rates were proportional to the cost of service," and the purpose of Phase II of the trial was to calculate damages. Nor did the court find, as Coziahr claims, that Otay was "owed a credit" for amounts "charged . . . below the proportional cost of service." (Italics omitted.) There is no merit to Coziahr's attempt to label parts of the court's Phase II refund calculation as "debts" and "credits."

Second, Coziahr argues Otay sought to apply an offset, while denying it was seeking an offset. There is no dispute Otay's refund calculation approach considered both undercharges and overcharges, to assess net damages. But Otay maintains, and we agree, that this case does not involve a cross-demand for money, or the application of an offset in a legal action.

Third, Coziahr argues that having failed to plead an offset, Otay waived the issue. Given that Otay did not seek an offset, any failure to plead one is not relevant.[22]

---

[22] Coziahr cites additional cases in asserting the refund involved an unpled, improper offset. (See, e.g., *Kruger v. Wells Fargo Bank* (1974) 11 Cal.3d 352, 362, 367-368; *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 728-732; *Morris Cerullo World Evangelism v. Newport Harbor Offices & Marina, LLC* (2021) 67 Cal.App.5th 1149, 1159.) Because no offset is at issue, these cases are inapposite.

b. *Coziahr Does Not Establish Any Other Legal or Equitable Grounds for Reversal*

Coziahr also argues that even if Otay had pled an offset, it never established a legal or equitable basis for it. Because Coziahr has not shown the refund method involved an offset, this argument fails. However, we elect to construe certain points as legal and equitable objections to the trial court's inclusion of lower tier charges, and address them. We conclude they lack merit as well.

First, Coziahr argues the refund calculation amounts to a "partial retroactive assessment" or "impermissible shadow ratemaking," which violates the procedural obligations of Section 6. (See § 6(a) [setting forth procedures for "imposing or increasing any fee or charge," including notice, a public hearing, and consideration of protests].) Specifically, he argues the calculation was based on rates not proposed to the public, citing *City National Corp. v. Franchise Tax Bd.* (2007) 146 Cal.App.4th 1040. *City National* is distinguishable, and his position lacks merit. (*Id.* at pp. 1042-1043 [reversing dismissal of tax refund action for not first paying disputed tax, where proposed assessments were not final].)

The rate used by the trial court to reflect what Otay should have charged (i.e., the constitutional rate) was developed by Coziahr's own expert, Vondle, for purposes of the Phase II refund calculations. Coziahr does not establish any additional fees are being "impos[ed] or increased" by Otay, or that any person or parcel is being levied as a result of the refund calculation. (See Gov. Code, § 53750, subd. (h)(1) [for article XIII D, " 'Increased,' when applied to a . . . property-related fee or charge, means a decision by an agency" that "A. Increases any applicable rate" or "B. Revises the methodology . . . if that revision results in an increased amount being levied

58

on any person or parcel"]; *Plantier, supra*, 7 Cal.5th at p. 385 [describing Gov. Code, § 53750, subd. (h)(1)(B)].)

Second, and along similar lines, Coziahr argues Otay has no basis to "assert a cross-demand for money from any class member," as they already "paid their water bills at the established rates." (Italics omitted.) By way of contrast, he cites lien procedures available to water districts with delinquent charges. (See Pub. Util. Code, § 16472.1.) He relatedly argues the trial court's method would make rates unpredictable, as "charges from one bill can retroactively impact" another. We view these points as variations of his procedural argument, and they rest on the same flawed assumption that the refund amounts to retroactive ratemaking.

Third, Coziahr contends there is no "equitable basis" for the refund method. We do not agree. The trial court found a refund amount that accounted for undercharges was "more reasonable . . . ." The court could fairly conclude an all-charges approach was both more consistent with the relief pursued by Coziahr under Section 6(b)(3), and a more reasonable way to provide a make-whole remedy. (See *Atkins, supra*, 8 Cal.App.5th at p. 738 [damages must be reasonable].) Coziahr alleged and established that Otay violated Section 6(b)(3) as to all SFRs by charging water rates that exceeded the proportional cost of service to the parcel. Otay reasonably argued, and the court accepted, that the refund had to "reflect both the underpayment in the lower tiers and any overpayment in the upper tiers" in the rate structure. We cannot say the court's conclusion was inequitable.[23]

---

[23]    We have considered Coziahr's arguments regarding other equitable considerations, and they do not persuade us to reach a different conclusion. We address a final point. Otay asserts Section 6(b)(3) *requires* inclusion of all charges in a refund calculation; Coziahr disagrees. Given the procedural posture—the trial court included all charges, and Coziahr has not shown

2. *Refund Calculations Were Unreasonable*

We now turn to Otay's objections to the calculations. Otay argues, in part, that the trial court's calculations were "impermissibly speculative and uncertain," including because it used projected water units rather than actual units and an "undercharge methodology" based on another case. We agree these aspects of the court's refund calculations were unreasonable, especially in light of the planned individual allocation phase, and we remand for a new trial on the refund amount.

a. *Additional Facts*

In Vondle's Phase II expert declaration, he used projected units from Otay's rate models to calculate an "average cost of water" to represent the constitutional rate. He offered a few alternative calculations; Alternative 2 was an "[a]verage rate for all customer classes." He then "multipl[ied] the projected units" in Tiers 2 and 3, by the difference between the "average cost of water" and the "actual rate used," to "get the overcharge for each tier for each period." He added these overcharges to arrive at a class refund, and estimated future overcharges based on a "trend of . . . generally increasing" overcharges.

In Vondle's rebuttal declaration, he described the refund approach adopted in the San Diego case, *Patz*, which involved using actual customer bills to calculate net overcharges based on water charges in all tiers. He explained it was "impossible to duplicate" these calculations, because Otay's SFR bills were "not available in the record . . . ." But, he indicated, an "approximate . . . amount for this case" could be calculated by (i) identifying

error—we need not and do not address whether this was the only permissible method to calculate a refund. (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102 [courts "avoid resolving constitutional questions if the issue may be resolved on narrower grounds"].)

the "proportion[al]" difference between the *Patz* refund and an overcharges-only version ("*Patz* case percentage"; updated to 74.25 percent at the Phase II hearing), and (ii) multiplying the *Patz* case percentage by an overcharges-only refund here.

Mumm opined, among other things, that actual units of water, not projected units, must be used in the damages calculation. His expert declaration appeared to use actual unit data.

In the Phase II Statement of Decision, the trial court adopted a refund methodology that consisted of "calculat[ing] . . . uniform rate[s] that could have been charged . . . during the class period," and comparing them to the "tiered rates actually charged . . . ." The court used Vondle's "Alternative 2" for the uniform rate calculation (and projected water unit numbers), noting Vondle was the plaintiff's expert in the *Patz* case and it accepted similar calculations there.

In explaining how it was going to consider undercharges, the trial court cited Vondle's rebuttal declaration, which described the approach in *Patz*, and stated that "[a]pplying this approach" here "recognizes that a comparable reduction was made in *Patz* where similar breakpoints" were used. The court noted an overcharges-only refund would be $24,384,184, impliedly multiplied this number by the *Patz* case percentage (74.25 percent), and found "total 'net' overcharges are reasonably estimated to be $18,105,256.60 through June 2021." The court stated "individual class member refunds will be determined during the refund allocation phase, with any adjustments to be made in light of customer billing," and "[n]o class member[ ] will receive more or less than he or she was overcharged" in the class period.

The trial court further found Otay continued to charge noncompliant rates, so as in *Patz*, the court "remedies these continuing violations by

61

increasing the award after June 2021 by $208,762.50 in overcharges each month thereafter" until Otay imposed rates consistent with Section 6(b)(3). The court also stated that "consistent with *Patz*, the Court will award pre-judgment and post-judgment interest . . . ." The judgment reflected the foregoing amounts.

> b. *Analysis*

The trial court's refund calculations relied unnecessarily on projected and proxy data, and thus were unreasonable under the circumstances. (See *Sargon, supra*, 55 Cal.4th at p. 774 [damages must have "reasonable basis of computation"].) Specifically, the court used projected water use units, not actual water units, and the *Patz* case percentage, to determine an estimated class refund award, even though actual water unit data was available (or could be) and the court was already planning an individual allocation phase using Otay customers' billing records. The court also relied on *Patz* as the basis for the monthly increases and prejudgment interest. Further, as Otay points out, the court did not explain what it would do with any surplus.

Coziahr does not establish the calculations were reasonable.

First, he contends the trial court "reserved jurisdiction for an administrative 'refund allocation phase' to finalize each individual class member's specific refund," and this "approach is well-established," citing *In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402 and *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715. The court said individual refunds "*will be determined* during the refund allocation phase, with any adjustments to be made in light of customer billing *upon this* [c]*ourt's consideration*." (Italics added.) This reflects the court anticipated a judicial, not administrative, determination, and that the key calculations (i.e., per individual parcel) would take place at that time. As for *Cipro* and *Bell*, they

62

are distinguishable, including because both focused on distribution of a set damages amount, not one still being calculated. (*Cipro*, at pp. 406, 417 [granting partial writ relief in challenge to certification; noting if "there is a finding at trial as to the amount of classwide damages, . . . individual entitlement . . . may be litigated in a nonadversary administrative claims procedure"]; *Bell*, at pp. 759-763 [appeal from judgment and distribution plan in wage and hour class action; affirming on most issues, and noting " 'allocation of [the] aggregate sum . . . is an . . . accounting question' "].)

Second, Coziahr defends the trial court's use of estimates based on Otay's actions. He contends that because Otay "never produced the individual bills necessary to precisely measure that offset," the court "did not require" a "bill-by-bill analysis." But Coziahr does not establish Otay " 'creat[ed] a situation in which the court must estimate rather than compute' " damages. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 908.) Coziahr bore the burden of proof on damages, both sides used classwide data, and he does not show he sought production of the individual bills that were not produced. More importantly, the trial court did not find it was unable to compute damages on an individual basis; rather, it deferred that step to a later "allocation" phase. (Compare *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1181 [court erred by declining to award lost profits, where "defendants deliberately thwarted legitimate discovery"; "special circumstances . . . may allow the court more latitude in estimating damages, particularly where the difficulty . . . arises from the defendant's bad faith"].)[24]

---

[24] Coziahr does not address the use of projected water units until his reply brief, where he asserts the difference from actual usage was " 'less than one percent' " and "[b]esides, actual usage data could be used in the allocation

We conclude a new trial limited to the refund amount is necessary and appropriate.  (Cf., e.g., *Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1220, 1225, fn. 1 [plaintiff was "entitled to a new trial limited to determining the amount of damages" for claim at issue].)  We will remand for a new trial on the refund amount, including the monthly increases and prejudgment interest, consistent with this opinion.  We express no view on the evidence to be considered on remand.  (Cf. *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 781, fn. 3 [declining to restrict trial court discretion on retrial of punitive damages].)

### III.     *Coziahr's Attorney's Fees*

Coziahr requests that if we at least affirm the judgment, we direct the trial court to award appellate attorney fees and costs when it determines trial court fees and costs.  He states "attorney fees would be appropriate under either the common fund doctrine or section 1021.5," and the judgment showed the trial court intended to hear this request after the appeal.

" 'Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees.' "  (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1267.)  That is appropriate here, where the trial court has not yet addressed fee entitlement, Coziahr did not prevail in his cross-appeal, and we are remanding for a new trial on the refund amount.  (Cf. *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 250 [remanding for determination of fees on appeal].)

---

phase . . . ."  His concession that actual data can be used for the allocation phase underscores that it was unreasonable to delay its use.

## DISPOSITION

The judgment is reversed as to the refund amount, including monthly increases and prejudgment interest, and is otherwise affirmed.  The matter is remanded for a new trial on the refund amount, which shall be conducted consistent with this opinion.  The parties shall bear their own costs on appeal.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

KELETY, J.